**NORTH SHORE GAS COMPANY,**
**Plaintiff–Appellant,**

v.

**ENVIRONMENTAL PROTECTION**
**AGENCY, et al.,**
**Defendants–Appellees.**

Nos. 91–1077, 91–1383.

United States Court of Appeals,
Seventh Circuit.

Argued March 1, 1991.

Decided April 25, 1991.

Nancy J. Rich, Atty. Gen., John J. Verscaj, Russell B. Selman, Bell, Boyd & Lloyd, Chicago, Ill., for North Shore Gas Co.

Gail C. Ginsberg, Thomas P. Walsh, Asst. U.S. Attys., Fred Foreman, U.S. Atty., Nancy K. Needles, Asst. U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., M. Alice Thurston, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for E.P.A., et al.

Douglas J. Rathe, Office of the Atty. Gen., Environmental Control Div., Chicago, Ill., M. Alice Thurston, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for Illinois E.P.A. and Bernard F. Killian.

Dale M. Cohen, Steven H. Frankel, Sonnenschein, Nath & Rosenthal, Jeffrey C. Fort, Gardner, Carton & Douglas, Chicago, Ill., M. Alice Thurston, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for Outboard Marine Corp.

Before POSNER, FLAUM, and MANION, Circuit Judges.

POSNER, Circuit Judge.

This is a needlessly complicated case; we shall prune it ruthlessly. The Environmental Protection Agency identified a portion of Waukegan Harbor, on Lake Michigan, as a "Superfund site," identified Outboard Marine Corporation as being responsible for the contamination of the site, and ordered Outboard to clean it up. Outboard resisted, the EPA sued, and a consent decree was entered containing a clean-up plan. One of the measures required by the plan was that Outboard convert a boat slip at the site into a facility for storing toxic wastes, thus making it unusable by the operator of the slip and his customers. To offset the inconvenience to them, the plan also required Outboard to construct a new slip elsewhere in the harbor, although within the boundaries of the Superfund site. Later the EPA identified another Superfund site in the harbor area. The two sites overlapped, and the new slip was in both. The EPA put the finger on North Shore Gas Company, a public utility, as a party potentially responsible for cleaning up the new Superfund site. North Shore believed that the construction of the new slip—which, as we said, was within the new site as well as within the old—would increase both the cost of cleaning up the new site, a cost that might come to rest upon North Shore as a potentially responsible party, and the (much lesser) cost of conducting a study that it had agreed with the EPA to undertake in order to determine the best way to clean up the new site. So North Shore asked the EPA to modify Outboard's "remediation" plan insofar as the construction of the new slip was concerned. The EPA made some modifications but not enough to satisfy North Shore, which brought this suit to enjoin the construction of the new slip. The principal grounds for the suit are the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and the Resource Conservation Recovery Act, 42 U.S.C. §§ 6901 *et seq.* North Shore argues that the construction of the new slip at the direction of the EPA is a major federal action significantly affecting the environment and therefore NEPA requires an environmental impact statement; also

that the new slip requires a permit under RCRA. There are pendent state law claims as well but they do not require separate discussion.

The district judge dismissed the suit as barred by section 113(h) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA—this lawsuit is a symphony of acronyms), as amended by the "Superfund Amendments" to CERCLA, 42 U.S.C. § 9613(h). 753 F.Supp. 1413. This section provides, with immaterial exceptions, that no federal court shall have jurisdiction "to review any challenges to removal or remedial action selected under" the Superfund Amendments. North Shore's appeal contends that the construction of the new slip is not "remedial action" (it surely is not "removal," *Barnet Aluminum Corp. v. Reilly*, 927 F.2d 289 (6th Cir.1991)). The EPA and the other defendants defend the district court's ground of dismissal and argue in addition that North Shore has no standing to complain about the violation of environmental statutes such as NEPA and RCRA.

■ We begin with standing. North Shore has standing in the Article III sense—it would derive a benefit if it won the suit, mainly because the construction of the new slip may increase the cost of cleaning up the new Superfund site and North Shore may be socked with that cost. True, that benefit would be probabilistic rather than certain, because North Shore's responsibility for the clean up has not yet been determined. But a probabilistic benefit from winning a suit is enough "injury in fact" (*Air Courier Conference v. American Postal Workers Union*, —— U.S. ——, 111 S.Ct. 913, 917–18, 112 L.Ed.2d 1125 (1991); *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)) to confer standing in the undemanding Article III sense. *Mount Wilson FM Broadcasters, Inc. v. FCC*, 884 F.2d 1462, 1465 (D.C.Cir.1989). Moreover, there would be a bit of certain benefit too if North Shore won; North Shore argues without contradiction that the survey of the new site that it is committed to conduct will cost more if the new slip is constructed at the site, as the remediation plan requires Outboard Marine to do.

■ However, two other concepts of "standing" may apply here. The first, perhaps ill-named but well established in antitrust and other legal contexts and deeply rooted in the common law, is the idea that not everyone injured by the violation of a statute will be permitted to sue to redress the violation. Suppose Corporation A incurs a loss in sales as a result of a violation of the antitrust laws by B, and Mr. C, an employee of A, loses a bonus as a result of his employer's sales loss. The law has been violated and C has been hurt as a result, but he will not be allowed to sue. *In re Industrial Gas Litigation*, 681 F.2d 514 (7th Cir.1982); see also *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); cf. *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 788–89, 100 S.Ct. 2467, 2476–77, 65 L.Ed.2d 506 (1980). It just is too difficult to trace out all the ramifications of a violation of law to justify allowing every person conceivably injured by eddies of illegal conduct to bring suit. Pollution can cause all manner of indirect injury. Manufacturers of brass fittings for yachts may incur business losses because sales of yachts decline in northern Illinois as a consequence of pollution in Waukegan Harbor, but it would be absurd to allow them to invoke the environmental laws in an effort to enjoin a measure that they think might aggravate that pollution. Plaintiffs would be tripping over each other on the way to the courthouse if everyone remotely injured by a violation of law could sue to redress it. An important purpose of rules of standing is to identify the best-placed plaintiff and give him a clear shot at suit—and by doing so to cut down on the number of suits, which is no trivial consideration in this age of swollen federal caseloads. On both points see *People Organized for Welfare & Employment Rights (P.O.W.E.R.) v. Thompson*, 727 F.2d 167, 172–73 (7th Cir.1984).

■ An additional consideration is that derivative losers tend to be offset by deriv-

ative gainers, who to prevent overdeterrence would have to be forced to make restitution to the violator—which of course is infeasible. *Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 473–74 (7th Cir.1982). In our hypothetical case, the loss to the manufacturers of brass fittings would be offset by gains to suppliers of the inputs into the clean up. What we are calling derivative losers and gainers are persons linked financially to the immediate injurers and victims, and such financial ramifications of an accident or other disaster tend to be offsetting and can therefore safely be ignored.

The linkage between the parties is a good deal more direct in this case than in the hypothetical case, as our recent decision in *Indiana Harbor Belt R.R. v. American Cyanamid Co.*, 916 F.2d 1174, 1175 (7th Cir.1990), helps show. The defendant caused a chemical spill that endangered people in the vicinity of the plaintiff's marshaling yard. The plaintiff itself was not endangered, but it was required by state law to clean up the spill, and it sued the defendant for the cost of the clean up. It was the principal entity actually hurt by the spill. No question was or could have been raised about its standing to maintain such a suit. North Shore's situation is similar.

But we are not done with standing. A third principle, closely related to the second, is that in general the only people who may sue to enforce a law are people who belong to the class that the law was designed to protect. This principle is applied in common law tort suits alleging the violation of a statutory duty of care, such as *Gorris v. Scott*, L.R. 9 Ex. 125 (1874); see generally *Prosser and Keeton on the Law of Torts* § 36, at pp. 225–27 (W. Page Keeton *et al.* eds. 1984). In the regulatory arena it goes by the name "zone of interests," *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), meaning simply that only intended beneficiaries of a statute can seek relief under it. The principle is as applicable to the environmental laws as it is to any other regulatory laws. *Lujan v. National Wildlife Federation*, — U.S. —, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990). As those laws are intended for the protection of the environment, not for the protection of persons deemed responsible for the consequences of having polluted the environment, the pollutees have standing but the polluters do not. North Shore does not claim to be injured as a result of inhabiting a polluted environment. It is not a user of Waukegan Harbor. Some of its ratepayers may be; and one of its arguments for standing is that it is suing as their representative. Organizations often do have standing to sue on behalf of their members; but passing the fact that North Shore is not a membership organization and is claiming the right to sue on behalf of individuals and firms who stand to it merely in a customer relation, there is a misfit between the definition of the "membership" and the injury complained of. The ratepayers are injured by pollution in the Waukegan Harbor not as ratepayers (except in the irrelevant financial sense that like North Shore they may bear some of the cost of clean up) but as users of the harbor, which some of them no doubt are and others—probably the majority—are not. Qua ratepayers—the status in which North Shore sues on their behalf—they are not within the intended protective scope of the environmental laws, and therefore neither they nor their representative have standing to sue. An organization may sue on behalf of its members only if "the interests it seeks to protect are germane to the organization's purposes." *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

Confining the right to sue under a statute to people within the "zone of interests" protected by the statute is not a constitutional command; it is a judicial gloss on the term that the Administrative Procedure Act uses to denote who can complain in court of agency action—only people "aggrieved" by the action. 5 U.S.C. § 702. So Congress can if it wants allow someone

injured in fact by the violation of a statute to bring suit to redress the violation even if he wasn't "aggrieved" in the sense that the courts have read into the APA—that is, even if he wasn't an intended beneficiary of the statute in the usual sense, though of course Congress's intent to allow him to sue makes him an intended beneficiary in a realistic sense. *Center for Auto Safety v. National Highway Traffic Safety Administration*, 793 F.2d 1322, 1335–38 (D.C.Cir. 1986). Maybe Congress did just this in RCRA, in allowing suits by "any person" to enjoin violations. 42 U.S.C. § 6972(a). This we need not decide, because North Shore concedes that the zone of interests test governs its RCRA challenge as well as its NEPA challenge. And North Shore flunks.

The district court was in any event right that the suit is blocked by the blunt withdrawal of federal jurisdiction in section 113(h). The withdrawal applies only to removal and to remedial actions, but the construction of the new slip is remedial. Suppose that some lethal contaminant were found in the federal courthouse in Chicago and the EPA declared the premises a Superfund site and ordered the entire building in which the court is housed torn down. And suppose further that the order contained a provision requiring the construction of covered pedestrian walkways adjacent to the building so that pedestrians could continue to use the sidewalks during the period of demolition. This construction—the counterpart to the construction by Outboard Marine Corporation of the new slip to accommodate boats that will no longer be able to use the old slip once it has been converted to a toxic-waste dump—would be a part, and a very important part, of the remedy ordered by the EPA. This is a practical rather than a semantic point. The cleanup of the first Superfund site will be delayed if Outboard and the EPA must come up with some other provision for the users of the old slip, soon to be made unusable. And the purpose of section 113(h) is to prevent litigation from delaying remediation. We hold that a measure that is ordered as part of a remedial plan, and that is reasonably relat-

ed to the plan's objectives so that it can fairly be considered an organic element of the plan, is itself remedial within the meaning of section 113(h).

So the suit is barred; North Shore must wait till the construction of the new slip is complete—indeed, till the entire clean-up of the old Superfund site is complete—before it can bring suit. Yet by then it may be too late. Suppose that as a result of the construction of the new slip, North Shore's cost of cleaning up its Superfund site will be $1 million greater. And suppose, had the EPA only listened to reason, it would have made some change as a result of which the entire cost would have been avoided at no added cost to Outboard Marine Corporation, the environment, or anyone or anything else. What could North Shore do at that time? Well, two exceptions to the bar of section 113(h) might come into play at that time. One would be a suit for contribution from someone else responsible for the pollution at the new Superfund site, § 113(h)(1), 42 U.S.C. § 9613(h)(1) (authorizing suits under CERCLA § 9607, therefore including § 9607(a)(4)(B), which, while vague, is universally assumed to refer to contribution actions). But all that such a suit would do if successful would be to shift the costs of the EPA's error, if that is what it was, to another party equally innocent of the error. Such a suit would not rectify the error, but merely change the victim.

A more promising possibility would be a suit for reimbursement of costs incurred by North Shore in response to a remedial order. If the court found that the order was arbitrary and capricious, it could require the EPA to reimburse North Shore for the added expenses caused by the order, or by the order's arbitrary and capricious component if the order was not arbitrary and capricious as a whole. 42 U.S.C. § 9606(b)(2)(D). This type of suit is excepted from section 113(h) too. 42 U.S.C. § 9613(h)(3). The rub is that the statute as worded envisages a suit by the person to whom the remedial order was addressed, and here that person is Outboard Marine, not North Shore. The interpretive problem

is not insurmountable. We are envisioning a situation in which the EPA orders North Shore to clean up the new Superfund site in Waukegan Harbor and North Shore argues that the costs of compliance are unnecessarily high because the EPA arbitrarily and capriciously refused to modify the order against Outboard Marine. The arbitrariness, the caprice, would, it seems to us, infect the new order.

Of this we cannot be certain; and there are no cases or legislative history bearing on the question. But it is notable that section 113(h) is captioned "timing of review" and that the cases and legislative history indicate that the purpose of the section was not to defeat an aggrieved person's presumptive right of judicial review of agency action, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670–73, 106 S.Ct. 2133, 2135–37, 90 L.Ed.2d 623 (1986), but merely to postpone the exercise of the right to the completion of the remedial action. *Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir.1990); *Alabama v. EPA*, 871 F.2d 1548, 1557–58 (11th Cir.1989). However, the method of section 113(h) is not to toll judicial remedies, and leave it at that; it is to specify the remedies that survive. Once the remedial action has been completed, a suit either to enjoin the action or to compel it is moot, and the statute does not authorize either form of suit. The responsible party is given his action for reimbursement, § 113(h)(3), or contribution, § 113(h)(1); the federal or a state government its suit to recover response costs, *id.*; the citizen complainer his action to enforce the order if it is not obeyed, § 113(h)(4). If the provision on suits for reimbursement is not interpreted generously, a firm in North Shore's position may find itself without any judicial remedy against arbitrary and capricious agency action, and that was not Congress's intent.

Still, the breadth of section 113(h) is troublesome. Suppose the EPA took the position that "Waukegan Harbor" includes Racine Harbor. Would there be no possibility for judicial review at the behest of users of Racine Harbor adversely affected by the application of the remedy to them? It looks that way, though no doubt the courts would strain to avoid so unappetizing a result. Cf. *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978). Our hypothetical users would have no suit for reimbursement unless they were ordered to clean the harbor up, and let us suppose they were not. In such a case section 113(h) would be doing a good deal more than affecting the "timing" of judicial review; it would be extinguishing judicial review. Fortunately the hypothetical case we have posed is considerably different from this one. This suit does not challenge the EPA's action in refusing to rescind the order for the construction of the new slip as an arbitrary and capricious application of the agency's Superfund powers. The suit is based on collateral statutes and as such runs straight into the bar of section 113(h). *Schalk v. Reilly, supra*, 900 F.2d at 1097. We can leave for another day the exploration of the outer bounds of this unusual provision.

█ Besides appealing from the dismissal of the suit, North Shore appeals from the denial of its "emergency" motion in the district court for a preliminary injunction pending the appeal from the dismissal. Our affirmance of the dismissal moots the second appeal but not the question pressed hard by the defendants of whether to impose sanctions on North Shore under Fed. R.App.P. 38 for taking a frivolous appeal. We do not think the appeal was frivolous. As should be apparent from our opinion, there is some probability, owing to the uncertain contours of the reimbursement provision, that North Shore will suffer irreparable harm from the EPA's action; and the greater the irreparable harm, the less likelihood of success the movant must show to obtain a preliminary injunction. *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 445 (7th Cir.1990); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387–88 (7th Cir.1984). The likelihood here was small—for that matter the showing of irreparable harm was rather tenuous, not only because North Shore may be able to sue for reimbursement but also because it has not yet been held to be a responsible

party. But given the complexity of the pertinent statutes and the novelty of the issues presented, we cannot pronounce North Shore's efforts to obtain injunctive relief pending appeal quixotic to the point of hopelessness.

AFFIRMED.