OIL, CHEMICAL & ATOMIC WORK-
ERS INTERNATIONAL UNION
("OCAW") AFL—CIO, et al., Plain-
tiffs,

v.

Federico PENA, Secretary of Energy
and the United States Department
of Energy, et al., Defendants.

Civil Action No. 97–1926(GK).

United States District Court,
District of Columbia.

June 29, 1999.

Daniel Guttman, Reuben A. Guttman,
Brian P. McCafferty, Traci L. Brushner,
Provost & Umphrey, Washington, DC, for
Oil, Chemical & Atomic Workers Interna-
tional Union, OCAW Local 3–288, Michael
Church, Claude J. Cumbie, James R. Hun-
ley, Jr., Anderson H. Worley.

Scott Sutherland Harris, U.S. Attorney's
Office, Washington, DC, for Federico
Pena.

Pamela Anne Bresnahan, Steven R.
Becker, Michael Timothy Lempres, Vorys,
Sater, Seymour & Pease, Washington, DC,
Jeffrey M. Hummel, Seyfarth, Shaw, Fair-
weather & Geraldson, Washington, DC, for
Community Reuse Organization of East
Tennessee.

Mark E. Nagle, Scott Sutherland Harris, U.S. Attorney's Office, Washington, DC, for Bill Richardson.

Kathy Butler Houlihan, Francis L. Casey, III, Morgan, Lewis & Bockius, L.L.P., Washington, DC, for BNFL, Inc.

### MEMORANDUM OPINION

KESSLER, District Judge.

This matter comes before the Court upon Plaintiffs, Oil, Chemical & Atomic Workers International Union's ("Plaintiffs" or "OCAW") Motion for Summary Judgment [# 150, # 200], Plaintiffs' Motion for Preliminary Injunction [# 192] [1], Plaintiff-Intervenors', led by Natural Resources Defense Council, ("Intervenors" or "NRDC") Motion for Summary Judgment [# 151], Federal Defendant, Department of Energy's, ("DOE"), Motion for Summary Judgment [# 153], and Defendant BNFL, Inc.'s ("BNFL") Motion for Summary Judgment [# 149]. Plaintiffs and Intervenors seek an Order from this Court compelling DOE to prepare an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, prior to BNFL's recycling of various surface contaminated and volumetrically contaminated metals recovered in the course of cleaning up a hazardous waste site at the Oak Ridge Reservation in Oak Ridge, Tennessee. Upon consideration of the parties' voluminous filings, the representations of the parties in open court at oral argument, and the entire record herein, Plaintiffs' Motion for Summary Judgment is **denied**; Plaintiffs' Motion for Preliminary Injunction is **denied as moot**; Intervenors' Motion for Summary Judgment is **denied**; DOE's Motion for Summary Judgment is

**granted**; and BNFL's Motion for Summary Judgment is **granted**.

### I. Factual Background[2]

The Oak Ridge Reservation in Oak Ridge, Tennessee, was, for nearly forty years, used to enrich uranium for nuclear weapon development and nuclear power generation. The facility was closed in 1985, and in 1989, the Environmental Protection Agency ("EPA") placed the Oak Ridge facility on its National Priorities List of contaminated sites. Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), 42 U.S.C. §§ 9601-75, EPA, DOE, and the Tennessee Department of Environment and Conservation entered into a Federal Facility Agreement ("FFA") to schedule the Oak Ridge facility for decontamination and decommissioning, waste management, and environmental remediation.

At issue in this case is the cleanup effort of three buildings at the K–25 Gaseous Diffusion Plant at the Oak Ridge Reservation. During nearly forty years of uranium enrichment activity at Oak Ridge, many tons of machinery were contaminated. The contaminated material, predominately metals, include both surface-contaminated metals and volumetrically-contaminated metals.[3]

In March 1997, the FFA, which did not originally include the K–25 D & D project, was amended to include a schedule for the removal action of the K–25 facility. After an extensive consultation and search process, DOE entered into a Contract with BNFL in August 1997 which provides, in

---

1. Plaintiffs' Motion for Preliminary Injunction was stayed pending resolution of the Cross-Motions for Summary Judgment.

2. While parties have submitted large statements of material facts pursuant to Local Rule 108(h), the Court has limited its recitation to those facts which are clearly undisputed.

3. Volumetric contamination occurs when radioactive contamination is distributed throughout the entire volume of a metal, as opposed to only the surface. NRDC Am. Compl. at ¶ 50.

the first phase, for the decontamination and decommissioning ("D & D") of three buildings within the K–25 compound, and, in the second phase, for disposal of those waste materials generated by the D & D procedure. Specifically at issue are provisions in the Contract which give BNFL the option of recycling contaminated metals for reintroduction into commerce. The parties have never disputed that the two options available to Defendants are either recycling or transportation of waste material to a nuclear waste site in Utah for burial. Plaintiffs concede that no EIS would be required for transportation and burial of the hazardous waste.

The process of recycling surface-contaminated metal is regulated under DOE Order 5400.5, Nuclear Regulatory Commission ("NRC") Regulatory Guide 1.86, and state regulations to be promulgated by the Tennessee Department of Environment and Conservation ("TDEC"). There is no national standard governing the release of volumetrically contaminated metals.[4] The Contract specifies that recycling will take place both on-site at the K–25 Compound, and off-site at the facilities of Manufacturing Sciences Corporation ("MSC"), a subcontractor of BNFL.

## II. Procedural Posture

Plaintiffs and Intervenors originally filed Complaints alleging a host of statutory violations arising from DOE and BNFL's contract to clean up the K–25 compound at the Oak Ridge Reservation. On June 3, 1998, on Defendants' Motions to Dismiss, this Court issued a Memorandum Opinion and Order dismissing the majority of claims, but allowing survival of the narrow issue of whether an EIS was required for the recycling and sale of scrap metal by-products of the cleanup procedure. *Oil, Chemical & Atomic Workers Int'l Union v. Pena*, 18 F.Supp.2d 6 (D.D.C.1998).

Discovery having been completed, that sole issue now comes before the Court on cross-motions for summary judgment.

## III. Standard of Review

A party against whom a claim … is asserted … may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof. … The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(b) –(c). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the movant has met this burden, a court must consider all factual inferences in the light most favorable to the non-moving party. *McKinney v. Dole*, 765 F.2d 1129, 1135 (D.C.Cir.1985). Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *McKinney*, 765 F.2d at 1135. Moreover, "[i]n determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Local Rule 108(h).

## IV. Statutory Scheme

### A. CERCLA

CERCLA was enacted to ensure the efficient and expeditious clean up of sites

---

4. In the absence of any national regulatory standard, it appears that TDEC will establish the standard for unrestricted release of recycled volumetrically contaminated metals. TDEC's process for establishing such standards admittedly provides for no public notice or comment.

contaminated with hazardous wastes and other pollutants. Pursuant to CERCLA, the federal government may either clean up a site and sue responsible parties for reimbursement, or force responsible parties themselves to undertake the cleanup action. Cleanup activities are generally referred to as "response" actions, and are divided into short-term "removal actions" and permanent "remedial actions". 42 U.S.C. §§ 9601(23) & (24).

While CERCLA authority is generally delegated to the Environmental Protection Agency ("EPA"), the President has delegated to the Department of Energy authority to clean up facilities under DOE jurisdiction, custody, or control.

Response action planning begins with a site assessment by the EPA. The EPA may list a particularly hazardous site on the National Priorities List ("NPL"), after comparing its potential threat to health and the environment with other CERCLA sites. The Oak Ridge Reservation was listed on the NPL in 1989.

Upon inclusion of a DOE facility on the NPL, DOE and EPA must enter into an interagency agreement to establish a framework for coordinating response actions. Where a "non-time critical removal action" is at issue, DOE must prepare an Engineering Evaluation/Cost Analysis ("EE/CA") to assess proposed actions and alternatives. 40 C.F.R. § 300.415(b)(4). The process of preparing the EE/CA must include a period for public review and comment.

Of particular importance to the present case, once a CERCLA cleanup action is initiated, Section 113(h) of CERCLA narrowly restricts federal court jurisdiction over environmental challenges to the cleanup action. Section 113(h) states in relevant part:

> No federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title.... 42 U.S.C. § 9613(h).

### B. NEPA

Congress passed the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, in 1970 to ensure that federal agencies properly consider the full environmental impact of major federal actions, as well as alternatives to the proposed actions. To accomplish that purpose, NEPA requires that a detailed Environmental Impact Statement ("EIS") be prepared for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

### V. *Analysis*

Defendants argue as a threshold matter that the Court should reconsider its earlier determination regarding the applicability of Section 113(h) to the proposed recycling plan.

In its Memorandum Opinion and Order of June 3, 1998, the Court specifically ruled on whether the proposed recycling plan falls within the scope of Section 113(h). Applying a summary judgment standard, the Court posed the issue in the following manner:

> [I]n determining whether the proposed recycling is part of the removal action, the Court will consider whether it has been (1) ordered as part of the remedial plan, (2) is reasonably related to the plan's objectives and (3) can fairly be considered an organic element of the plan. *Oil, Chemical & Atomic Workers Int'l Union,* 18 F.Supp.2d at 23.

After reviewing the relevant documents before it, particularly, the EE/CA, the Court concluded that recycling was "selected" as part of the plan's remedial provisions, but was not ordered, since the recycling component rested in the discretion of BNFL. Furthermore, the Court relied upon Plaintiffs' and Intervenors' representation that title to unrecycled metals would revert to DOE, which led to

the conclusion that "the recycling of the recovered metals will occur only if it serves BNFL's economic advantage...." *Id.* at 24. The Court therefore held that because institution of the proposed recycling project was a purely discretionary decision of BNFL's, it could not be considered an "organic element" of the removal plan.

■ Plaintiffs and Intervenors assert that Defendants' Section 113(h) challenge to the Court's subject-matter jurisdiction is foreclosed by the law of the case doctrine. That doctrine, as applied by our Court of Appeals, holds that "the same issue presented a second time in the same case in the same court should lead to the same result". *LaShawn v. Barry,* 87 F.3d 1389, 1393 (D.C.Cir.1996) (citations omitted). Courts should decline to reconsider decided issues "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice' ". *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). Accordingly, the Court will review its earlier ruling only for clear error and "manifest injustice".

## A. CERCLA Jurisdiction

■ Every court that has ever addressed Section 113(h) of CERCLA has recognized that Congress enacted the provision to deter litigation delaying tactics and interference with cleanup actions. The United States Court of Appeals for the Third Circuit, for instance, upon reviewing the legislative history behind Section 113(h), concluded that "Congress enacted § 9613(h) to prevent judicial interference, however well-intentioned, from hindering EPA's efforts to promptly remediate sites that present significant danger to public health and the environment". *Clinton County Comm'rs v. EPA,* 116 F.3d 1018, 1023 (3rd Cir.1997). In reaching that conclusion, the Third Circuit Court of Appeals

relied upon a report of the House Committee on Public Works and Transportation, which explained that:

> The purpose of [§ 9613(h) ] is to ensure that there will be no delays associated with a legal challenge of the particular removal or remedial action selected under section [9604] or secured ... under section [9606]. Without such a provision, responses to releases or threatened releases of hazardous substances could be unduly delayed, thereby exacerbating the threat of damage to human health or the environment. A person's rights to challenge the choice of removal or remedial action are preserved, however, and can be exercised ... [through] a citizen suit alleging that the removal or remedial action *was* in violation of any requirement of the Act.... *Id.* at 1024 (quoting H.R.Rep. No. 99–253(V), at 25–26 (1985) (alteration in original)).

*See also Costner v. URS Consultants, Inc.,* 153 F.3d 667, 674 (8th Cir.1998) (referring to Congressional intent to prevent time-consuming litigation); *Barmet Aluminum Corp. v. Reilly,* 927 F.2d 289, 293 (6th Cir.1991) (recognizing Congress' additional concerns to prevent piecemeal litigation and conserve EPA's limited resources). It simply cannot be denied that Congress intended to preclude all litigation which would delay, or worse, halt governmental efforts to clean up hazardous waste sites.

The disputed issue is, rather, whether the proposed recycling plan in this case is part of the cleanup activity which Congress sought to protect. Section 113(h) applies to "removal" or "remedial" actions selected pursuant to 42 U.S.C. § 9604. Those terms are defined at 42 U.S.C. §§ 9601(23) and (24), which provide in relevant part:

> The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment ..., the *disposal of re-*

*moved material,* or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment. . . .

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment. . . . The term includes, but is not limited to, such actions at the location of the release as . . . *recycling or reuse*. . . . [T]he term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials. 42 U.S.C. §§ 9601(23) and (24) (emphasis added).[5]

The parties are in agreement that the proposed recycling plan at issue has been designated a "removal action". The essential question before the Court, then, is whether Defendants' proposed "recycling" comes within the definition of "disposal of removed material" such that the plan falls within the scope of Section 113(h).

### 1. Language of the EE/CA, Contract, and Statement of Work

The clearest indicator of the nature of the recycling plan comes from the language of the documents setting forth the plan itself and the relationship between the federal government and BNFL.

The Court's greatest concern has been, at all stages of the litigation to this point, that BNFL retains sole discretion whether or not to recycle contaminated metals. That point is undisputed. Defendants argue, however, that BNFL is *absolutely* required to dispose of all accumulated waste material, even though BNFL makes the final decision as to whether such dis-

posal is by way of recycling or transportation for burial at a nuclear waste site in Utah.

The language of the EE/CA supports the contention that recycling has long been contemplated by Defendants as the primary method of waste disposal. To begin with, the Introduction to the EE/CA states, in describing the three alternatives then under consideration, that "Alternative 2, equipment removal and building decontamination, *includes* the removal, collection, and transportation of recyclable materials (process components, piping, and equipment) to the private sector for *recycling and processing for reuse.* This alternative is preferred. . . ." EE/CA at p. 1–2 (emphasis added). The EE/CA then goes into greater detail, explaining that under Alternative 2, "[d]isposition of equipment and scrap metal will take advantage of recycling, reuse, or unrestricted release when possible and economically feasible." *Id.* at 4–2, ¶ 4.1.3. Additionally, the EE/CA explains that Alternative 2 is preferred because it "support[s] the programmatic waste minimization goal by releasing materials for reuse and/or recycle. . . ." *Id.* at 4–11, ¶ 4.3. *See also id.* at 5–6, ¶ 5.4.1. and 5–17 (setting forth the role of recycling in the context of the entire cleanup action).

Although the language in the EE/CA is neither as precise nor as airtight as might be desired, the fact of the matter is that several key provisions of the document demonstrate that recycling has been the preferred method of disposal since the inception of the cleanup proposal. In fact, the documentary evidence suggests that the comparatively low figure for which BNFL contracted its services reflects the contracting parties' expectations that

---

**5.** Plaintiffs and Intervenors argue that because the phrase "recycling or reuse" is included within the statutory definition of a "remedial action" but not that of a "removal action", recycling is necessarily precluded as part of a removal action.

Such an interpretation of the statutory language, however, loses sight of the fact that the statutory definition of "removal action" uses the much broader language "disposal of removed material" which may reasonably be read to include recycling of removed wastes.

BNFL would reap additional proceeds from recycling contaminated metals.[6]

Even apart from the Contract's preference for recycling, the Statement of Work ("SOW") governing the D & D of the K–25 facility makes abundantly clear that BNFL is absolutely required to dispose of all waste whether by recycling or otherwise.

Section 2.9.1, entitled "Process Equipment to be Removed", specifically provides that:

> The Contractor [BNFL] shall remove *all* process equipment and related materials from within the interior of all three buildings ... The removal activities of the process equipment and related materials will also involve the disassembly, size reduction, packaging and shipping to either an offsite, commercial decontamination facility, or removal from the ETTP and release to scrap sales. SOW, DOE's Ex. D, at ¶ 2.9.1 (emphasis added).

Similarly, Section 2.14.5, entitled "Waste Disposal", states:

> The Contractor shall be responsible for disposal of *all* project wastes. ... The Contractor shall be financially responsible for all aspects of packaging, characterization, manifesting, transportation and disposal of waste associated with execution of this statement of work. *Id.* at ¶ 2.14.5 (emphasis added).

These two provisions clearly require BNFL to dispose of all waste products generated during the cleanup action, without reference to any particular method of disposal. The fact that BNFL retains discretionary authority to choose the particular method of disposal does *not* in any way affect its obligation to dispose of waste as part of the CERCLA cleanup action.

As additional support, BNFL cites to EPA guidance documents which recommend that all EPA orders governing the treatment of hazardous waste sites provide for flexible and general response actions to ensure cost-effectiveness in the contracting process. In particular, BNFL refers to one portion of the EPA document which states that:

> When selecting a treatment technology to address the source of contamination, this typically involves selection of a treatment *class or family* ... rather than a specific technology process option. ... Selection of a treatment class affords the lead agency flexibility during the remedial design to procure the most cost-effective process through competitive bidding. *Guidance on Preparing Superfund Decision Documents*, BNFL's Ex. 23, at 9–11 to 9–15 (emphasis added).

This language, it appears, reflects a broader agency objective of providing flexibility with respect to the particular details of a cleanup action in order to accommodate various complications which may arise.

Plaintiffs and Intervenors pose a number of arguments as to why the proposed recycling plan is not an organic element of the cleanup action and is therefore not subject to Section 113(h). They first argue that the terms "recycle" and "disposal" are distinct and separate concepts under the language of the Contract.

The SOW, Plaintiffs note, includes one section governing "Recycling Activities" and another concerning "Project Waste". SOW, DOE's Ex. D, at ¶¶ 2.12 and 2.14. Section 2.12 states that:

> The Contractor shall determine the most economical means of dispositioning the process equipment and materials removed from the K–29, K–31 and K–33

---

**6.** Plaintiffs and Intervenors have argued that during the pendency of this action, the market price of nickel has fallen so low that BNFL's incentive to recycle is considerably reduced.

Even if this factual representation is accurate, it does not change the fact that when DOE and BNFL entered into this contract, recycling was viewed as the primary method of disposal. The parties' intent at the time of entering into the Contract and Statement of Work is not to be judged on the basis of subsequent events which have transpired.

Buildings and is encouraged to promote waste minimization through recycle to the extent that recycling of materials and equipment does not result in increased project costs over other dispositioning options, such as disposal.

Section 2.14.5, entitled "Waste Disposal", requires that:

The Contractor shall be responsible for disposal of all project wastes.... The Contractor shall be financially responsible for all aspects of packaging, characterization, manifesting, transportation and disposal of waste associated with execution of this statement of work.

Plaintiffs and Intervenors argue that the very fact that "recycling actions" and "waste disposal" are discussed in two separate sections of the SOW necessarily means that Defendants contemplated two different types of actions.

While that interpretation of the SOW is possible, it is not, as Plaintiffs and Intervenors suggest, the most plausible interpretation. In fact, the more logical reading of these two provisions appears, from their plain language, to be a requirement under 2.14.5 that BNFL dispose of all "waste" generated by the project, with a strong preference under 2.12 for waste minimization through recycling activities if possible. Nowhere in 2.14.5 is there any indication that recycling cannot be one method for disposal of waste. Thus, the two provisions are not necessarily mutually exclusive.[7]

Plaintiffs next refer to the fact that Defendants failed to make any mention of "recycling" when enacting the March 1997 Amendment to the Federal Facility Agreement, which pertained to the removal action for the K–25 facility. The original FFA did not incorporate recycling as a part of any removal action. Pursuant to CERCLA Section 9617, "major" amendments to the FFA require public notice and comment. When Defendants enacted the March 1997 Amendment to the FFA, however, the changes were deemed "minor", and no measures were therefore taken to disseminate notice or solicit public comment. Plaintiffs argue, however, that the new technology required to recycle contaminated metals clearly constitutes a "major" change. Defendants' failure to follow the procedure for making "major" amendments to the FFA, Plaintiffs assert, demonstrates that recycling could not have been intended to be an organic element of the removal action.

Defendants have provided no adequate explanation as to why the 1997 Amendment to the FFA did not deem recycling an integral part of the cleanup action, which would then have triggered public notice and comment opportunities. That fact is quite troubling. However, in the context of a large cleanup action, where the EE/CA and the Statement of Work clearly designate recycling as the preferred method of disposing of accumulated waste, the Court cannot conclude that the single fact of the government's failure to

---

7. Plaintiffs also cite to the Contract language in Section H–18(c), which states that:

Contractor is a Response Action Contractor as that term is defined in CERCLA 119(e) for the purposes described in Section 119(a) of CERCLA to the extent that Contractor is conducting activities identified in the Statement of Work, including options, pursuant to this contract, and to the extent that Contractor is providing services relating to the disposal of DOE Wastes resulting from such activities. However, Contractor is *not* a Response Action Contractor pursuant to CERCLA 119 for Non–DOE Waste, or to the extent that it is *selling or recycling scrap material* generated as a result of its D

& D activities. The foregoing shall also apply to similar causes of action brought under state law. DOE's Ex. D, at ¶ H–18(c).

Plaintiffs point to this Section and argue that even the DOE–BNFL Contract makes a very clear distinction between the Contractor's disposal and recycling activities.

The Response Action Contractor distinction is not, however, directly relevant for purposes of determining whether recycling is an organic element of the removal action. The extent to which a party is a Response Action Contractor affects only the party's liability arising out of the removal action. BNFL is at all times required to undertake disposal.

address recycling in the Amendment to the FFA removes recycling from the purview of the cleanup action as a whole. The fact of the matter is that BNFL *must* dispose of all waste products generated through the D & D process, whether by recycling or some other method.[8]

█ Distilled to its core, then, Defendants' basic premise is that the built-in flexibility of the Contract, SOW, and EE/CA, which permits BNFL to select between recycling or burial of waste metal, does not remove the proposed recycling plan from the larger context of "disposal" protected by Section 113(h).[9] Plaintiffs' and Intervenors' arguments notwithstanding, the language of the documents governing this cleanup action clearly demonstrates that recycling has always been the vastly preferred method of "disposing" of the waste products, and is to be regarded as an integral part of the cleanup action as a whole. Furthermore, with respect to the question of whether the government may design a cleanup action which incorporates some degree of contractor flexibility, the

case law surrounding Section 113(h) is insightful.

## 2. Case Law

While it does not appear that this precise issue has ever been ruled on, a number of courts have considered the broader question of whether "disposal" is an inseparable portion of a CERCLA action, and is therefore protected from judicial challenge by Section 113(h).

The case which appears most analogous to the present lawsuit is *Nevada v. Leary*, No. 94–576, slip op. (D.Nev. Jan. 12, 1995), an unpublished decision from the District of Nevada submitted by DOE as Exhibit B to its earlier Motion to Dismiss. In *Nevada*, DOE had, for many years, regularly shipped large quantities of low-level radioactive waste to the "Nevada Test Site" ("NTS") for disposal as part of various nationwide CERCLA cleanup actions. The State of Nevada, after twenty years without complaint, filed a NEPA action claiming that the agency had not prepared the necessary EIS before transferring

---

8. It is important to note that no EIS has been performed as to recycling or any other method of disposal. Plaintiffs and Intervenors could, in the future, easily bring additional NEPA challenges to all of Defendants' proposed methods of disposal which, if successful, would bring the entire cleanup action to a standstill. This is exactly the type of interference which Congress sought to preclude with Section 113(h).

9. In the course of briefing the earlier Motion to Dismiss, Plaintiffs and Intervenors made the factual representation that title to contaminated metals would revert from BNFL to DOE should BNFL choose not to recycle. That allegation was critical to the Court's determination that recycling is not an organic element of the CERCLA action. Conspicuously, neither Plaintiffs nor Intervenors presently raise that argument.

Upon close review of the Contract and SOW, it is apparent that only two provisions even marginally support Plaintiffs' and Intervenors' original contention. Section 2.13 of the SOW, entitled "Disposition of Classified Material", states that "[a]ll classified process equipment and material recovered during the execution of this project shall remain proper-

ty of the Government until such time as it has been rendered unclassified through processing.... Once the material is declassified, the material will be the property of the Contractor." SOW, DOE's Ex. D, at ¶ 2.13. Section G–5(b) of the Contract then states:

> In further consideration of performance, the Contractor shall receive title to all property to be dismantled or demolished ... that is not specifically designated as being retained by the Government.... If the Contractor does not wish to remove from the site any of the property acquired, the Contracting Officer may, upon written request, grant the Contractor permission to leave the property on the premises. As a condition to granting of this permission, the Contractor agrees to waive any right, title, claim, or interest in and to the property. Contract, DOE's Ex. D, at ¶ G–5(b).

What these provisions suggest is far from Plaintiffs' and Intervenors' original assertion that BNFL could simply choose not to recycle, with title reverting automatically to DOE. Rather, Section G–5 appears to be a limited exception, requiring DOE's permission before title reverts. Accordingly, the Court rejects Plaintiffs' and Intervenors' earlier factual misrepresentation.

waste from a site in Fernald, Ohio. Because the NTS site was used only for disposal purposes, Nevada's claim necessarily challenged only the disposal portion of the CERCLA cleanup actions.

The district court, in concluding that the state's NEPA challenge was precluded by Section 113(h), looked carefully at the Consent Agreement entered into between DOE and the operators of the Fernald facility. The court observed that "the Consent Agreement and its amendments clearly contemplate the use of the NTS as a part of its remedial and removal actions. . . . Were an injunction to issue requiring the cessation of such disposal, such actions would impede the cleanup effort at Fernald." *Id.* at 15–16.

In the instant case, the Court, having scrutinized the Contract, SOW, and EE/CA with great care, has already concluded that recycling has long been regarded an integral part of the cleanup action. Issuance of an injunction against recycling now would interfere with the cleanup action at the K–25 Facility just as much as the proposed injunction in *Nevada.* The same logic applied by the district court in that case to deny an injunction applies here as well.

In *Schalk v. Reilly,* 900 F.2d 1091 (7th Cir.1990), the United States Court of Appeals for the Seventh Circuit considered a broader NEPA challenge to a CERCLA cleanup action. There, EPA planned a CERCLA cleanup action which included a removal action, followed by disposal of hazardous waste through burning. Plaintiffs filed a NEPA claim against the entire cleanup action, alleging that EPA failed to prepare an EIS. Looking to the plain language of CERCLA, the Court of Appeals concluded that the NEPA challenge was precluded by Section 113(h).

The situation in *Schalk* resembles the case before this Court to the extent that the plaintiffs in *Schalk* brought their claim

once a disposal method had been chosen, but prior to its implementation. By dismissing the entire claim as barred by Section 113(h), however, the Court of Appeals implicitly ruled that the disposal action was an integrated portion of the cleanup action as a whole. *Id.* at 1095.

In fact, nearly every court to address the scope of Section 113(h) has concluded that litigation which interferes with even the most tangential aspects of a cleanup action is prohibited. In *North Shore Gas Co. v. EPA,* 930 F.2d 1239 (7th Cir.1991), for instance, the United States Court of Appeals for the Seventh Circuit rejected a NEPA challenge pursuant to Section 113(h) in which the plaintiff sought to prevent EPA from ordering construction of a new boat slip after a planned cleanup action eliminated the use of an old boat slip. Applying the now familiar standard, the Court of Appeals held that "a measure that is ordered as part of a remedial plan, and that is reasonably related to the plan's objectives so that it can fairly be considered an organic element of the plan, is itself remedial within the meaning of section 113(h)." *Id.* at 1244.[10] The cleanup action as a whole, the Court of Appeals determined, would be delayed if EPA had to find some other way to accommodate the users of the old boat slip. Even such minimal interference was sufficient to bar the plaintiff's claim under Section 113(h).

The evidence presented in the instant case demonstrates that Plaintiffs' and Intervenors' requested remedy would significantly interfere with, and most probably halt, the cleanup action of the K–25 compound. The few alternatives which Plaintiffs and Intervenors offer are themselves vague and untested. Plaintiffs and Intervenors concede that the most viable alternative, shipment of the contaminated waste to Utah for burial, is both inordinately expensive and potentially more dangerous than recycling. Another alternative, a disposal site in Tennessee, is at

---

**10.** While the cleanup action in *North Shore* was a remedial action rather than a removal action, the Court of Appeals' language clearly suggests that the analysis applies to both.

least two years from completion, and is designed to store a category of much lower level waste.

While Plaintiffs and Intervenors favor onsite storage of waste in containers, Defendants hotly dispute the viability of that option. Although the Court is in no position to make a reliable factual determination as to the availability of onsite storage space, it does seem that Plaintiffs' suggestion that Defendants should recontaminate buildings with waste storage when they have just been decontaminated borders on the surreal. The alternative storage method, which is to build additional containers or facilities, and then determine what waste should be stored on-site and offsite, necessarily involves a drastic increase in both the expenses and the timeline for the cleanup action. It is therefore crystal clear that the injunction sought by Plaintiffs and Intervenors would fundamentally alter the nature of the cleanup project.

In sum, all the evidence and case law now presented before the Court supports a finding that the proposed recycling plan comes within the scope of Section 113(h). The documents setting forth the relationship between the federal government and BNFL clearly demonstrate that the proposed recycling plan constitutes one method of "disposal of removed material" in the context of a CERCLA removal action. While there is legitimate concern that BNFL retains ultimate discretion whether or not to recycle, the language of the Contract makes it very clear that BNFL is unequivocally required to dispose of all waste which is generated in the D & D process. The Contract simply reflects what appears to be a common governmental practice to preserve some degree of flexibility in the cleanup process. This cleanup plan differs from others solely in the unprecedented scale and volume of the proposed recycling.

Furthermore, the weight of the case law surrounding Section 113(h) clearly supports the premise that disposal of waste is an integral part of a CERCLA cleanup action, and any interference with the cleanup action is prohibited. Plaintiffs and Intervenors can cite no case law to the contrary. As such, the Court finds no reasonable basis for concluding that a disposal plan which permits a contractor to select one of two available options for disposal, so long as full disposal is mandated, falls outside the breadth of Section 113(h).

At this stage of the litigation, the parties have engaged in extensive discovery, and the Court is now presented with a much broader set of facts than were available at the Motion to Dismiss stage. With the case narrowed solely to the issue of the proposed recycling plan, the parties have been able to flesh out their arguments so the case can be seen in its full context. Upon review of the broader scheme of the cleanup action, it is now clear that the proposed recycling plan set forth in the Contract and Statement of Work between DOE and BNFL comes within the rubric of a CERCLA cleanup action, and Plaintiffs' and Intervenors' challenge pursuant to NEPA is precluded by Section 113(h). Accordingly, the Court rules that clear error and "manifest injustice" warrant reconsideration of its earlier ruling on the Motion to Dismiss. For these reasons, the Department of Energy's Motion for Summary Judgment is **granted;** BNFL, Inc.'s Motion for Summary Judgment is **granted.**

### 3. The Court's Concerns

The Court acknowledges and shares the many concerns raised by Plaintiffs and Intervenors. The potential for environmental harm is great, especially given the unprecedented amount of hazardous materials which Defendants seek to recycle.[11] The parties have not provided the Court, however, with any evidence of the safety of

---

11. While the parties dispute the exact amount of metals subject to recycling, at least 100,000 tons of metal are scheduled to be recycled pursuant to the proposed recycling plan.

recycling in comparison with any other method of disposal.

The Court is further concerned by the fact that no national standard exists governing the unrestricted release of volumetrically contaminated metals. Both EPA and NRC have attempted to develop federal regulatory standards for volumetrically contaminated metals, but both agencies have tabled their efforts in order to focus on other concerns. The result is no oversight by any federal regulatory agencies. Instead, TDEC, which has neither the resources nor the extensive expertise of a national regulatory agency, is the only body with any supervisory power.

Section 113(h) is very clear, however, that courts are not to interfere with ongoing cleanup actions. The fact that EPA and NRC, after taking years to try to develop national standards, were unable to do so because of inability to develop consensus in the scientific community does not relieve the Court from applying Section 113(h) in accordance with Congressional intent.

Plaintiffs and Intervenors have also raised legitimate concerns as to the lack of public notice and comment surrounding the entire process by which Defendants settled on recycling as a disposal method. While it is true that Plaintiffs and Intervenors had an opportunity to raise their concerns during the first and only public comment period following publication of the EE/CA, it is nevertheless startling and worrisome that from that early point on, there has been no opportunity at all for public scrutiny or input on a matter of such grave importance.

The lack of public scrutiny is only compounded by the fact that the recycling process which BNFL intends to use is entirely experimental at this stage. The process has not been implemented anywhere on the scale which this project involves. Plaintiffs allege, and Defendants have not disputed, that there is no data regarding the process' efficacy or track record with respect to safety. Further-

more, even as of March 18, 1999, when parties appeared before the Court for a Status Conference, it was not fully clear when BNFL would be granted the legal rights to use the recycling process.

While the concerns raised by Plaintiffs and Intervenors are entirely legitimate, this Court must nevertheless follow the dictates of the applicable Congressional statute. Congress enacted Section 113(h) for the best of reasons—namely to prevent interference with efforts to cleanup hazardous, contaminated sites. Whether or not the situation here is what Congress had in mind, the Court cannot ignore the clear wording of Section 113(h). At this stage, where the government has structured and begun a complex cleanup action, Section 113(h) makes abundantly clear that the Court is not to interfere.

### B. NEPA

The Court, having concluded that the proposed recycling plan falls within the protection of Section 113(h), need not dwell on the merits of the NEPA claim. The Court simply notes that if recycling were outside the scope of 113(h), the proposed plan is exactly the type of action which would come within the scope of NEPA. The significant level of financial support expended by DOE in furtherance of the recycling plan serves as a basis for federal action. *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 155 (D.C.Cir. 1985); *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir.1973). Furthermore, the level of governmental involvement and the granting of discretion to BNFL provide ample additional support for concluding that the proposed plan constitutes a major federal action. *Scientists' Institute for Public Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079 (D.C.Cir.1973); *Defenders of Wildlife v. Andrus,* 627 F.2d 1238 (D.C.Cir.1980); and *Sierra Club v. Penfold,* 857 F.2d 1307, 1312–13 (9th Cir. 1988).

The amount of controversy this matter has engendered, along with the precedential value of the recycling plan, is ample evidence that the proposed recycling

significantly affects the quality of the human environment. In the absence of Section 113(h), an EIS would clearly be mandated under NEPA.

## VI. *Conclusion*

Plaintiffs and Intervenors here sought to bring a NEPA challenge to a proposed recycling plan entered into between DOE and BNFL. Because the recycling plan comes within the boundaries of a CERCLA cleanup action, however, the Court lacks subject-matter jurisdiction over the claim pursuant to 42 U.S.C. § 9613(h). Accordingly, Plaintiffs' Motion for Summary Judgment is **denied;** Intervenors' Motion for Summary Judgment is **denied;** DOE's Motion for Summary Judgment is **granted;** and BNFL's Motion for Summary Judgment is **granted.** Plaintiffs' Motion for Preliminary Injunction is further **denied as moot.**

All claims are hereby disposed of. A separate Order will issue with this Memorandum Opinion.