FARMERS AGAINST IRRESPONSI-BLE REMEDIATION (FAIR) by its President, Charles HANEHAN; Charles Hanehan; Willard H. Peck; Steven P. Griffen; Thomas Kugler; and Sean Quinn, Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Christine Todd Whitman, Administrator of the United States Environmental Protection Agency, Defendants.

New York Farm Bureau,
Inc., Amicus Curiae.

No. 01CV1183(LEK)(DEP).

United States District Court,
N.D. New York.

Sept. 20, 2001.

Dean S. Sommer, Young, Sommer Law Firm, Albany, NY, for plaintiffs.

Michael D. Rowe, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, George Shanahan, New York City, for U.S. Environmental Protection Agency, Christine Todd Whitman.

Elizabeth Corron Dribusch, Glenmont, NY, for New York Farm Bureau, Inc, amicus.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

Presently before the Court are Plaintiffs' motion for a preliminary injunction and Defendants' cross motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below, Plaintiffs' motion is DENIED and Defendants' motion is GRANTED in part and DENIED in part.

### I. Background

#### A. Factual Background Regarding Hudson River Contamination

From approximately 1940 until 1977, the General Electric Company ("GE") owned and operated two capacitor power plants located in Fort Edward and Hudson Falls, New York. During this thirty seven year time frame, evidence indicates that these plants discharged somewhere between 209,000 to 1,330,000 lbs. of polychlorinated

biphenyls ("PCBs") directly into the Hudson River (alternatively "Hudson" or the "River"). Many of the PCBs discharged ultimately settled at various downstream portions of the River's bed.[1] In 1976, Congress became concerned about health risks associated with the use of PCBs and prohibited, in part, their manufacture, processing, and distribution in commerce. *See* 15 U.S.C. § 2605(e) (1998). Shortly thereafter, the Fort Edward and Hudson Falls capacitor plants stopped releasing PCBs into the environment.

## B. Regulatory Decisions Regarding PCB Contamination

The New York State Department of Environmental Conservation ("NYSDEC") first surveyed those portions of the Hudson River contaminated by PCBs in 1976. It conducted later surveys in 1978 and 1984 and found that various areas downstream from the two capacitor plants were "PCB hotspots."[2] Beginning in 1975, the New York State Department of Health ("NYSDOH") issued health advisories recommending that people limit their consumption of fish caught in the upper portions of the Hudson River. Beginning in 1976, PCB contamination of the Hudson River had reached such a level that NYSDEC banned all fishing in its upper portions, *see* N.Y.Comp.Codes R. & Regs. tit. 6, § 12.19(b) (1976), and striped bass commercial fishing in its lower portions, *see* N.Y.Com.Codes R. & Regs. tit. 6, § 11.3 (2001).

These blanket prohibitions on fishing in the Hudson River were lifted in 1995 when the NYSDEC replaced the ban with a catch and release policy. Nevertheless, commercial striped bass fishing in the lower Hudson is still banned. *See id.* NYSDOH also recommends that people do not eat any fish caught in the upper Hudson, and that children under the age of fifteen and pregnant women avoid eating fish caught in the lower Hudson.

In 1983, the EPA designated a 230 mile stretch of the River, extending from Hudson Falls to the Battery in New York City, as eligible for inclusion on the "National Priorities List for the Federal Superfund Program" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). *See* 42 U.S.C. 9601 *et seq.* In 1984, the Hudson River site was formally placed on the Superfund list. Due to perceived difficulties with technology existing in 1984 that could effectively alleviate the Hudson River PCB problem, the EPA issued a formal Record of Decision ("1984 ROD") in September of that year stating that, in the "interim," it would take no action to remedy the existing problem.

On December 19, 1989, defendant EPA sent a letter to NYSDEC stating that it intended to reassess its 1984 interim no action decision. A study, conducted in three separate phases, analyzed the various options that the EPA might use to ameliorate the Hudson River PCB contamination problem. Pursuant to findings made in this "Reassessment Feasibility Study" ("Reassessment FS"), the EPA concluded in December 2000 that technological innovations made since 1984 would allow it to remove safely and efficiently contaminated PCB sediment from specific "hot spots" remaining in the Hudson River.

---

1. In particular, they settled around the former Fort Edward Dam, subsequently removed by the Niagara Mohawk Power Company in 1973.

2. Those portions of the River qualifying as a "PCB hotspot" had PCB concentrations of 50 parts per million or greater.

After issuing the Reassessment FS, the EPA immediately sought public commentary on it pursuant 42 U.S.C. § 9617(a). For 120 days following the EPA's issuance of the Reassessment FS, interested members of the public were invited to submit written comments[3] or attend one of forty public meetings the EPA sponsored to obtain feedback on the Reassessment FS.[4] Plaintiffs' organization, Farmers Against Irresponsible Remediation ("FAIR"), submitted approximately fifty single spaced pages of commentary and offered oral comments at several public meetings.

## C. Procedural Background

FAIR instituted the above captioned case on July 23, 2001, alleging that Defendants failed to disclose certain vital information it needed to participate meaningfully in the EPA's notice and commentary period. Particularly, Plaintiffs argue that Defendants should have publicly disclosed basic information regarding the locations of hazardous waste treatment plants, mines used to provide backfill material, and any highway and rail routes that might be used to implement its dredging decision. Plaintiffs argue that the EPA's failure to disclose this information violated, *inter alia*, their First Amendment rights, various CERCLA provisions, the National Contingency Plan ("NCP"), and the National Environmental Policy Act ("NEPA"). They seek both a declaratory judgment from this Court declaring such and a preliminary injunction preventing Defendants from issuing a final Record of Decision that memorializes the conclusions made in the Reassessment FS. Plaintiffs argue, in part, that Defendants should not issue a formal decision regarding the Hudson River Superfund Site until they disclose this information and allow the public to provide commentary.

In response, Defendants filed a motion to dismiss, arguing, in part, that the Court does not have subject matter jurisdiction over those causes of action in Plaintiffs' complaint related to its injunctive relief request, that these causes of action fail to state a claim upon which relief can be granted, and that Plaintiffs are not entitled to the relief they seek. Since the Court concludes that it does not have subject matter jurisdiction over those portions of Plaintiffs' complaint which underpin its request for injunctive relief, it does not address the other matters raised.

## II. Discussion

### A. Subject Matter Jurisdiction Standard

■ A court may dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure when it lacks the constitutional or statutory power to adjudicate the case. *See* FedR.Civ.P. 12(b)(1). In fact, because federal courts are courts of limited jurisdiction and can adjudicate "only those cases within the bounds of Article III of the United States Constitution and Congressional enactments stemming therefrom," *Walsh v. McGee*, 899 F.Supp. 1232, 1236 (S.D.N.Y.1995), whenever "it appears by suggestion of the parties or otherwise" that the Court lacks jurisdiction over the subject matter it must affirmatively dismiss the action, Fed.R.Civ.P. 12(h)(3).

■ As such, the burden of proving that a federal court has subject matter jurisdiction over an action rests upon the party attempting to invoke the court's jurisdiction, *see Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942),

---

**3.** EPA received over 70,000 written comments on the Reassessment FS.

**4.** These meetings were held at geographically disparate locations spread throughout the affected Hudson River region.

and no presumption of truth attaches to the non-moving party's allegations, *see Brown v. American Legion Cortland City Post 489,* 64 F.Supp.2d 96, 97 (N.D.N.Y. 1999). Moreover, since a dismissal under 12(b)(1) is not a dismissal on the merits and is without res judicata effect on the underlying merits of the claims, when a court dismisses a case pursuant to 12(b)(1), it is precluded from exercising supplemental jurisdiction over related state claims. *See Cushing v. Moore,* 970 F.2d 1103, 1106 (2d Cir.1992).

**B. General Jurisdictional Bar of 42 U.S.C. § 9613(h)**

■ In part, 42 U.S.C. § 9613(h), entitled "Timing of review," expressly limits the jurisdiction of federal courts to hear certain cases arising under CERCLA. *See Reardon v. U.S.,* 947 F.2d 1509, 1512 (1st Cir.1991). The relevant portion of section 9613(h) states:

> No Federal court shall have jurisdiction under Federal law ... to review *any challenges* to removal or remedial actions selected ... in any action except: (4) an action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken ... was in violation of any requirements of this Chapter. *Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at that site.*

42 U.S.C. § 9613(h)(4) (emphasis added). Stated simply, section 9613(h)(4) allows citizens to challenge any remedial or removal action undertaken pursuant to CERCLA only *after* the action is complete. *See Clinton County Comm'rs v. United States Envtl. Prot. Agency,* 116 F.3d 1018, 1022 (3d Cir.1997). In essence, it prohibits preenforcement judicial review of certain

CERCLA claims. *Reardon,* 947 F.2d at 1512.

Congress enacted section 9613(h)(4) as part of the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). *See* Pub.L. No. 99–499, 100 Stat. 1613 (1986). The rationale behind the enactment of this section rested heavily on Congressional findings that CERCLA, as drafted in 1980, was not adequately allowing the EPA to rapidly clean up toxic waste sites that were endangering public health. *See* H.R.Rep. 99–253 at 22 (99th Cong. 1st Sess.1985); *Reardon,* 947 F.2d at 1513; *Voluntary Purchasing Groups, Inc. v. Reilly,* 889 F.2d 1380, 1386–87 (5th Cir.1989). Instead CERCLA, as initially drafted, was providing a vehicle for creative attorneys to sue the EPA whenever it decided to clean a hazardous waste site. Because of the frequency and expense of this litigation, the EPA found itself in the position of defending itself from numerous lawsuits surrounding cleanup sites instead of actually removing the toxic waste these sites contained. *See* H.R.Rep. No. 99–253(V), at 25–26 (1985) (stating that the "purpose of [§ 9613(h) ] is to ensure that there will be no delays associated with a legal challenge of the particular removal or remedial action selected.")

■ As a result, Congress enacted section 9613(h) to limit the public's ability to challenge EPA cleanup decisions and bolster CERCLA's goal of granting the EPA "full reign to conduct or mandate uninterrupted clean-ups." *B.R. MacKay & Sons, Inc. v. United States,* 633 F.Supp. 1290, 1292 (D.Utah 1986). In effect, it provided additional support for the EPA's ability to shoot first and ask questions later as it facilitated cleanup of hazardous waste discharges. *Id.* at 1294;[5] *see also Exxon*

---

**5.** The Court in *B.R. MacKay & Sons* stated:

It appears that with the dangers or poten-

*Corp. v. Hunt*, 475 U.S. 355, 359–60, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986). To this end, almost every single circuit has concluded that section 9613(h) supplies a "blunt withdrawal of federal jurisdiction" to adjudicate pre-enforcement claims levied against any EPA decision to undertake removal or remedial action at a particular hazardous waste site. *North Shore Gas Co. v. Environmental Prot. Agency*, 930 F.2d 1239, 1244 (7th Cir.1991); *Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1474 (9th Cir.1995); *Clinton County Comm'rs*, 116 F.3d at 1024; *Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control & Ecology*, 999 F.2d 1212, 1218 (8th Cir.1993); *Alabama v. United States Envtl. Prot. Agency*, 871 F.2d 1548, 1557 (11th Cir.1989).[6]

## C. Jurisdictional Bar of Section 9613(h) as Applied to Plaintiffs' Section 9617 and Section 9621(b)(1)(G) Causes of Action—Second and Third Causes of Action

■ Under 42 U.S.C. § 9617, the EPA, before adopting any plan for remedial action must "publish a notice and brief analysis of the proposed plan and make [that] plan available to the public." 42 U.S.C. § 9617(a)(1). In addition, the EPA must "[p]rovide a reasonable opportunity for submission of written and oral comments and an opportunity for a public meeting at or near the facility at issue regarding the proposed plan and regarding any proposed findings." 42 U.S.C. § 9617(a)(2). The statute declares that any notice and analysis published under 42 U.S.C. § 9617(a)(1) must "include *sufficient information* as may be necessary to provide a reasonable explanation of the proposed plan and alternate proposals considered." 42 U.S.C. § 9617(a) (emphasis added). Section 9621(b) sheds some light on section 9617(a)'s requirement that any analysis published contain sufficient information to provide a reasonable explanation of the proposed plan. Specifically, 42 U.S.C. § 9621(b)(1)(G) requires that the EPA take into account, in part, the "potential threat to human health and the environment associated with the excavation, transportation, and redisposal or containment" before assessing the viability of any remedial action. 42 U.S.C. § 9621(b)(1)(G).

Plaintiffs' primary contention is that because the EPA's Reassessment FS failed to disclose information related to the locations of any hazardous waste treatment plants, backfill mines, and transportation routes that might be utilized as part of the dredging project, it did not take into account the relevant threats set forth in 42 U.S.C. § 9621(b)(1)(G) when drafting the Reassessment FS. In addition, Plaintiffs argue that because the Reassessment FS failed to disclose this information, it did not provide *sufficient information* necessary to comply with 42 U.S.C. § 9617(a). In response, Defendants argue that 42 U.S.C. § 9613(h)(4) precludes the Court from adjudicating the merits of both of these claims until after it moves forward

---

tial dangers caused by hazardous substances, shooting first and asking questions later was the intent of Congress, making it clear that under CERCLA the EPA should have and has full reign to conduct or mandate uninterrupted cleanups for the benefit of the environment and the populous. *See B.R. MacKay & Sons*, 633 F.Supp. at 1294. Although that CERCLA case arose prior to Congressional enactment of SARA,

Courts have noted that SARA's incorporation of section 9613(h) was meant to codify that line of jurisprudence. *See Voluntary Purchasing Groups*, 889 F.2d at 1386 n. 10 (citing this passage of *B.R. MacKay & Sons* in reference to section 9613)

**6.** The Second Circuit has not yet expressed any opinion on the scope of section 9613(h).

with the dredging project. The Court agrees with Defendants.

CERCLA defines a removal action to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). In addition, it expressly states that "any action taken under section 9604(b) of this title," granting the President the statutory authority to undertake the Reassessment FS, constitutes a removal action. *See* 42 U.S.C. § 9604(b). Courts interpreting the term "removal action," as defined in 42 U.S.C. § 9601(23), have repeatedly held that Congress intended it be given a broad interpretation. *See Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 926 (5th Cir.2000); *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 843 (6th Cir. 1994); *United States v. Akzo Nobel Coatings, Inc.*, 990 F.Supp. 897, 905 n. 18 (E.D.Mich.1998).

In light of the plain language of the statute and existing case law interpreting it, the Court holds that the EPA's issuance, management and creation of the Reassessment FS, and administration of the section 9617(a) notice and commentary period constitutes a removal action as defined under 42 U.S.C. § 9601(23). *See Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir.1996); *Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 239 (9th Cir.1995); *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 840 (6th Cir.1994); *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1018 (3d Cir.1991); *General Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1417–19 (8th Cir.1990). Because section 9613(h)(4) prohibits a citizen from bringing a law suit

that challenges a removal action when, as here, a remedial action is to be undertaken at a site, Plaintiffs' claim that Defendants did not follow the mandates of section 9617(a) or 9621(b)(1)(G) when they failed to disclose certain information in the Reassessment FS is presently barred. The Court therefore dismisses Plaintiffs' second and third causes of action.

### D. Jurisdictional Bar of Section 9613(h) as Applied to Plaintiffs' NEPA Claims—Fourth Cause of Action[7]

For similar reasons the Court also holds that it must dismiss Plaintiffs' claim that Defendants' alleged failure to create a comprehensive environmental impact statement (or its "functional equivalent"), in conjunction with the Reassessment FS, violated NEPA. *See* 42 U.S.C. § 4332(2)(c). Although Courts may generally review NEPA claims under 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. § 702, such review is not available if another statute specifically precludes judicial review. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Here, section 9613(h)(4) specifically precludes "any challenges" to CERCLA removal actions, "not simply those brought under the provisions of CERCLA itself." *Costner v. URS Consultants*, 153 F.3d 667, 674 (8th Cir.1998); *see also Schalk v. Reilly*, 900 F.2d 1091, 1097 (7th Cir.1990); *Alabama v. United States Envtl. Prot. Agency*, 871 F.2d 1548, 1560 (11th Cir. 1989). Accordingly, if Plaintiffs' NEPA claim directly challenges the EPA's removal action described above, it is barred by section 9613(h).

---

**7.** Plaintiffs' fourth cause of action alleges a violation of NEPA while Plaintiffs' third cause of action reference NEPA as part of its alleged denial of public participation rights. To the extent that Plaintiffs' third cause of action seeks to allege an independent NEPA violation, it is addressed in this section.

The Ninth Circuit has opined that lawsuits "directly related to the goals of the cleanup itself" constitute challenges to removal actions. *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 330 (9th Cir.1995). This approach, adopted by at least one other Circuit, *see Costner*, 153 F.3d at 675, requires a Court to dismiss a claim, pursuant to section 9613(h), if the relief sought constitutes "the kind of interference with the cleanup plan that Congress sought to avoid or delay by the enactment of Section 113(h)." *McClellan*, 47 F.3d at 330. In line with this approach, the Ninth Circuit has further held that state law damages claims arising from the EPA's diversion of water from a cleanup are not "challenges" to a cleanup since their resolution does "not involve altering the terms of the cleanup order." *Beck v. Atlantic Richfield Co.*, 62 F.3d 1240, 1243 (9th Cir.1995). If, however, the remedy sought interferes with the cleanup, the Court held that section 9613(h) bars the Court from adjudicating the merits of the underlying claim. *See id.*

In this case, Plaintiffs' NEPA claims seek to impose an obligation on the EPA that would directly interfere with the ongoing removal process. They wish to compel the EPA to conduct its removal process in accordance with the mandates of NEPA's environmental impact and public participation requirements. If the Court granted Plaintiffs the relief they seek, the River cleanup might be indefinitely delayed as the EPA would have to engage in a costly and burdensome environmental analysis that might take many years. This is especially true given that it took the EPA approximately 11 years [8] before it finally issued its 632 page study, which, in many respects, touches upon many matters a NEPA environmental impact study would examine. In addition, if the Court found that NEPA was applicable and it compelled the EPA to conduct an additional notice and commentary period based on its requirements the same concerns of delay which Congress sought to avoid when it enacted section 9613(h) would be implicated.

This is not to say that Plaintiffs' arguments regarding NEPA's notice and commentary requirements or the EPA's need to conduct a NEPA environmental impact statement before commencing the dredging project lack merit. Nor does it mean that the Court will never adjudicate the merits of these claims or that, as stated at oral argument, Defendants have blanket immunity to carry out their dredging project without any judicial oversight. Instead, the Court, as section 9613(h) requires, must adjudicate these claims after the EPA's remedial action at the Hudson River is undertaken. *See Alabama*, 871 F.2d at 1560.[9] Consequently, the Court

---

**8.** This eleven year time frame spans the period between which the EPA sent its December 19, 1989 letter notifying NYSDEC that it intended to reassess its 1984 interim no action decision and the issuance of the Reassessment in December of 2000.

**9.** The Court is also sympathetic to Plaintiffs' argument that such a holding denies them their day in court by rendering their claim moot at the time when it might later be brought. Nevertheless, as the Ninth Circuit Court of Appeals aptly noted when holding that section 9613(h) barred various non-CERCLA claims levied against McClellan Air

Force Base that sought to have it comply with environmental laws:

> We recognize that the application of Section 113(h) may in some cases delay judicial review for years, *if not permanently, and may result in irreparable harm to other important interests*. Whatever its likelihood, such a possibility is for legislators, and not judges, to address. We must presume that Congress has already balanced all concerns "and concluded that the interest in removing the hazard of toxic waste from Superfund sites" clearly outweighs the risk of irreparable harm.

dismisses Plaintiffs' fourth cause of action and their third cause of action to the extent it too raises a NEPA challenge.

### E. Jurisdictional Bar of Section 9613(h) as Applied to Plaintiffs' First Amendment Challenge—First Cause of Action

■ The jurisdictional bar of section 9613(h) applies differently when it comes to Plaintiffs' First Amendment claim. Most courts have flatly concluded that because section 9613(h) bars pre-enforcement judicial review of "any challenges to removal or remedial actions selected," it also bars pre-enforcement judicial review of constitutional challenges to CERCLA itself. *See Aztec Minerals Corp. v. United States Envtl. Prot. Agency,* No. 98–1380, 1999 WL 969270, at *3 (10th Cir. Oct.25, 1999) (concluding that section 9613(h) barred plaintiff's due process claim as to the EPA's regulation of a mine); *Barmet Aluminum Corp. v. Reilly,* 927 F.2d 289, 295 (6th Cir.1991) (holding that the district court lacked jurisdiction to enjoin the EPA, on due process grounds, from regulating plaintiff's landfill); *Schalk,* 900 F.2d at 1097 (rejecting plaintiff's ability to bring pre-enforcement due process and equal protection claims against the Environmental Protection Agency); *Broward Garden Tenants Ass'n v. United States Envtl. Prot. Agency,* 157 F.Supp.2d 1329, 1340–41 (S.D.Fla.2001) (holding that section "9613(h) bars judicial review over constitutional challenges to CERCLA"); *South Macomb Disposal Auth. v. United States Envtl. Prot. Agency,* 681 F.Supp. 1244, 1252 (E.D.Mich.1988) (holding that section 9613(h) precluded pre-enforcement judicial review of plaintiff's constitutional challenge

CERCLA). The rationale behind these opinions rests on the fact that section 9613(h) does not prevent statutory and constitutional challenges to CERCLA in their entirety, but, instead, delays judicial review of such challenges. *See Barmet Aluminum Corp.,* 927 F.2d at 295; *Cf. Clinton County Comm'rs,* 116 F.3d at 1025.

The First Circuit in *Reardon v. United States,* 947 F.2d 1509 (1st Cir.1991), has adopted a slightly different approach. In *Reardon,* the First Circuit held that a due process challenge to several CERCLA statutory provisions did not fall within the section 9613(h) jurisdictional prohibition. *See Reardon,* 947 F.2d at 1515. The *Reardon* Court distinguished between a constitutional challenge to CERCLA itself and a constitutional challenge to a particular removal or remedial action. *See id.*

■ The First Circuit reasoned that, even though fundamental notions of sovereign immunity grant Congress the ability to preclude judicial review of constitutional claims, the language of section 9613(h) did not indicate a clear Congressional intent to preclude review of all CERCLA constitutional claims. *See id.* at 1514. Instead, the First Circuit concluded that because the language of section 9613(h) only barred challenges to "removal or remedial actions," it did not apply to facial constitutional challenges of CERCLA itself. *See id.* Because plaintiff's due process claim in *Reardon* was not a challenge "to EPA's administration of the statute—claims that EPA did not 'select[ ]' the proper 'removal or remedial action,' in light of the standards and constraints established by the

McClellan Ecological Seepage Situation v. Perry, 47 F.3d 325, 329 (9th Cir.1995) (quoting Boarhead Corp., 923 F.2d at 1023) (emphasis added). This seemingly harsh result is a function of the fact that the Court may not give

Plaintiffs, however well intentioned, a "day in court" to which they are not presently entitled. See Hanford Downwinders Coalition, 71 F.3d at 1484.

CERCLA statute," it was not barred. *See id.*

In this Court's view the reasoning of the First Circuit is persuasive. Critical to this Court's adoption of the *Reardon* approach is the significant legislative history indicating that section 9613(h) was passed to prevent cleanup delay and decrease response costs. *See* S.Rep. No. 11 99th Cong., 1st Sess. 58 (1985); H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 81. Although this means that Congress wished to preclude pre-enforcement statutory and constitutional challenges to removal or remedial actions, nothing in either the Senate or House Report suggests that Congress sought to preclude judicial review of the CERCLA statute itself while a particular action was undertaken. *See Reardon,* 947 F.2d at 1516.

Unfortunately for Plaintiffs, even under the *Reardon* standard, their First Amendment claims are barred. Plaintiffs assert first that their First Amendment rights were violated because Defendants refused to provide access to the information they seek as part of the notice and commentary debate. As a secondary assertion, Plaintiffs contend that the EPA's failure to disclose this information deprived it of a First Amendment "public forum" with which to comment on it.

At oral argument, Plaintiffs were pressed about whether either of these claims were constitutional challenges to CERCLA itself or simply constitutional challenges to the manner in which the EPA administered the statutory notice and commentary period. Initially Plaintiffs' attorney hedged his answer to this question. The Court then queried Defendants' attorney as to whether section 9613(h) provided the EPA with hypothetical absolute immunity to categorically ignored the mandates of section 9617. Defendants' attorney responded that section 9613(h) did provide the EPA such immunity. On rebuttal, Plaintiffs' attorney emphatically declared that if section 9613(h) did operate to allow the EPA to unilaterally ignore the requirements of section 9617, then they were challenging the constitutionality of section 9613(h) itself.[10]

Assuming for arguments sake that the section 9617 notice and commentary period does constitute a public forum for purposes of First Amendment analysis,[11] the Court does agree with Plaintiffs that if the EPA utterly ignored its requirements or issued a FS that was so ludicrous that it prevented any meaningful public participation as to how a decision might be made, section 9613(h) might not bar Plaintiffs' First Amendment challenge. But that is not the situation here. In this case, Defendants engaged in a comprehensive assessment of the various alternatives open to them and issued a voluminous report detailing its conclusions.

Ideally, the public debate and commentary on the FS might have been more informed had Defendants disclosed the information sought. At the same time, as Defendants stated both at oral argument

---

**10.** The basis of this assertion appeared to rest on Plaintiffs' argument that section 9617 created a "public forum" for purposes of First Amendment analysis which Defendants could not deny them access to unless they crafted a narrowly tailored exclusion that served a compelling state interest. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

**11.** This opinion's subsequent discussion of section 9617's notice and commentary period requirements as a public forum for purposes of First Amendment analysis is based on this initial assumption and does not in any way indicate that the Court holds that section 9617's notice and commentary period is in fact a First Amendment "public forum."

and in the deposition of Allison Hess, this information is not currently available in the manner that Plaintiffs wish. The Reassessment FS simply concluded that the EPA believed that dredging was the most viable method to remedy the existing Hudson River PCB problem. The exact routes, roads, mines, and incinerators used to implement this conclusion will be determined during the design phase of the project.

Plaintiffs are correct when they assert that because section 9617 does not extend into the remedial action's design phase, they may never have an opportunity to comment on it in that statutorily created public forum.[12] Nevertheless, the inability of Plaintiffs to utilize section 9617 as this information is developed is not a function of the EPA arbitrarily withholding it or deceptively closing the section 9617 public forum in an effort to prevent public debate. Congress expressly provided that the forum must close, to the extent it exists, once the EPA issues its final remedial action plan. See 42 U.S.C. § 9617(b). This Court does not have the power to act as a super-legislature and effectively rewrite CERCLA to extend the notice and commentary period past the time that Congress provided.

As a result, the Court concludes that Plaintiffs' "public forum" argument, notwithstanding their assertions at oral argument, is not a facial constitutional challenge to CERCLA. Rather it is a constitutional challenge to the EPA's management of the section 9617 notice and commentary period. Because it seeks to compel the EPA to comply with the CERCLA statute itself, it is barred under Reardon and the Court so holds.

■ Similar flaws exist with regard to Plaintiffs' First Amendment "right to access" argument, which is premised on Defendants' failure to turn over the same information that they seek pursuant to 42 U.S.C. § 9621(b)(1)(G). Nothing Plaintiffs have provided to the Court indicates that their First Amendment right of access claim somehow challenges CERCLA itself. Instead, it seeks to have the Court compel the EPA to comply with the "standards and constraints established" by 42 U.S.C. § 9621(b)(1)(G). Reardon, 947 F.2d at 1514. Consequently, this claim is also barred under the Reardon approach.

Boiled to its essentials, both of Plaintiffs' First Amendment claims rest upon a disagreement with the EPA's administration of the statutorily created notice and commentary period and do not challenge the constitutionality of the statute itself. For this reason the Court holds that it lacks subject matter jurisdiction to adjudicate the merits of Plaintiffs' first cause of action. It is therefore dismissed.[13]

## F. Plaintiffs' Fifth and Sixth Causes of Action

Plaintiffs' request for injunctive relief is based solely on their first four causes of action. Defendants' cross-motion to dismiss is limited to those four causes of

---

**12.** Plaintiffs can of course utilize any other forum, such as newspapers, radio, or other media outlets to comment on this information as it is released.

**13.** The only two courts to have concluded that section 9613(h) does not bar any constitutional claims against the EPA as it undertakes removal or remedial action are Reeves Brothers, Inc. v. United States Envt'l Prot. Agency, 956 F.Supp. 665 (W.D.Va.1995) and Washington Park Lead Comm., Inc. v. United States Envtl. Prot. Agency, No. 2:98 CV 421, 1998 WL 1053712 (E.D.Va.1998). These cases are not persuasive to the Court in light of the unanimous circuit court jurisprudence rejecting their holding, the plain language of section 9613(h), and the legislative history surrounding its adoption.

action except for a footnote that mischaracterizes Plaintiffs' fifth and sixth causes of action as not asserting any additional claims. Since Plaintiffs' fifth cause of action arguably asserts a claim based on the EPA's alleged violation of various segments of CERCLA as a result of its "completed" 1984 Remedial Action and neither party has substantively addressed that cause of action's merits in their current motion papers, Defendants' motion to dismiss as it relates to that cause of action is denied without prejudice to refile.

Plaintiffs' sixth cause of action seeks declaratory relief on the basis of each of the five preceding causes of action. Since the Court has already concluded that it lacks jurisdiction over the first four causes of action, it follows that it also lacks jurisdiction over those portions of Plaintiffs' sixth cause of action that are based on these four causes of action. As such, the Court dismisses those portions of Plaintiffs' sixth cause of action that are based upon Plaintiffs' first four causes of action.

At the same time, one part of Plaintiffs' sixth cause of action seeks declaratory relief based on the fifth cause of action. Since, as already noted, neither party has addressed the merits of that cause of action, the Court denies without prejudice to refile, Defendants' motion to dismiss as it relates to that portion of the sixth cause of action based on the fifth cause of action.

## IV. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiffs' motion for a preliminary injunction is DENIED; and it is further

ORDERED that Defendants' motion to dismiss is GRANTED in part and DENIED in part; and it is further

ORDERED that Defendants' motion to dismiss as it relates to the first four causes of action in the above captioned complaint is GRANTED; and it is further

ORDERED that the first four causes of action in the above captioned complaint are DISMISSED in their entirety; and it is further

ORDERED that Defendants' motion to dismiss as it relates to Plaintiffs' fifth cause of action is DENIED without prejudice to refile; and it is further

ORDERED that Defendants' motion to dismiss as it relates to Plaintiffs' sixth cause of action is GRANTED to the extent that it encompasses those portions of the complaint already dismissed; and it is further

ORDERED that those portions of Plaintiffs' sixth cause of action related to the first four causes of action are DISMISSED in their entirety; and it is further

ORDERED that Defendants' motion to dismiss as it relates to Plaintiffs' sixth cause of action is DENIED without prejudice to refile to the extent that it encompasses those portions of the complaint not yet dismissed; and it is further

ORDERED that the Clerk shall serve copies of this Order by United States Mail upon the attorneys for the parties appearing in this action.

IT IS SO ORDERED.