**Laura JACH and Roy Jach, Individually And on Behalf of a Class of Similarly Situated Persons 4655 Massachusetts Avenue, N.W. Washington, DC 20016 Plaintiffs,**

v.

**AMERICAN UNIVERSITY and United States of America Defendants.**

**No. CIV.A. 02–1580(ESH).**

United States District Court, District of Columbia.

Feb. 20, 2003.

Richard S. Lewis, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, Tracy D. Rezvani, Finkelstein, Thompson & Loughran, Washington, DC, for Laura Jach, Roy Jach.

Mitchell E. Zamoff, Hogan & Hartson, LLP, Washington, DC, for American University.

Joel Eric Wilson, U.S. Attorney's Office Special Assist. to U.S. Atty., Washington, DC, for U.S.

### *MEMORANDUM OPINION*

HUVELLE, District Judge.

On August 8, 2002, plaintiffs Laura and Roy Jach, individually and on behalf of a proposed class of similarly situated residential property owners, brought suit against the United States ("the government") and The American University ("AU") asserting claims related to the contamination and cleanup of hazardous waste in their Washington, D.C. neighborhood of Spring Valley. (Compl.¶ 1.) Plaintiffs allege that the government, by contaminating Spring Valley, has taken their property in violation of the Fifth Amendment, U.S. Const. amend. V. (*Id.* ¶¶ 68–72.) Plaintiffs have also brought suit against AU for its acts and omissions as the previous owner and neighbor of plaintiffs' property. (*Id.* ¶ 10) The action against AU is based solely on common law tort claims. (*Id.* ¶¶ 73–100.)

The government has moved under Fed. R.Civ. P. 12(b)(1) to dismiss plaintiffs' complaint on the grounds that the Comprehensive Environmental Response Compensation Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9613(h), divests the Court of subject matter jurisdiction over their claim. (Memorandum in Support of United States Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) ["U.S. Mem."] at 1.) [1] For the reasons dis-

---

1. In the alternative, the government argues that the Court has no jurisdiction over this case pursuant to the Tucker Act, 28 U.S.C. 1346(a)(2), which grants the United States Court of Federal Claims exclusive jurisdiction over takings claims against the federal government in excess of $10,000. Given the Court's resolution of the government's CERCLA argument, it need not reach this alternative argument.

cussed below, the government's motion to dismiss is granted. As a result, the Court has no jurisdiction over plaintiffs' claims against AU, and they will therefore be dismissed without prejudice.

## BACKGROUND

This Court has addressed matters involving the government's use of AU's campus during World War I on several occasions. *See, e.g., Loughlin v. United States,* 230 F.Supp.2d 26 (D.D.C.2002); *Loughlin v. United States,* 209 F.Supp.2d 165 (D.D.C.2002); *W.C. & A.N. Miller Companies v. United States,* 963 F.Supp. 1231 (D.D.C.1997). The historical backdrop to this case is the same and need only be summarized briefly here. In April 1917, in order to support the war effort against Germany, AU offered the United States the use of its 92–acre campus in what is now known as the Spring Valley neighborhood of Northwest, Washington, D.C. The government accepted AU's offer and established the American University Experiment Station ("AUES") on the property. The AUES was the site of a massive training, research and testing ground for conventional and chemical warfare techniques. The Army conducted projects and field tests related to the development, testing and manufacture of gases, toxic and incendiary munitions, smoke mixtures, and signal flares. These activities were conducted using gas shells, smoke clouds, mortars, projectiles, hand grenades and flaming liquid weapons. *Loughlin,* 230 F.Supp.2d at 29. At the end of the war, the AUES was dismantled and the government vacated the AU campus. (Compl.¶ 25.) In 1920, AU and the Army agreed that the Army would build eight buildings for AU in lieu of its obligation to clear and restore the property before returning it to AU. (*Id.* ¶ 26.)

Over the ensuing decades, portions of the property were sold for residential development. (*Id.* ¶ 27.) In 1986, AU also undertook construction on the property it retained. At that time it contacted the Environmental Protection Agency ("EPA") and the Army for assistance in obtaining information to substantiate or refute reports of buried munitions on its property. (*Id.* ¶¶ 28–30.) Buried munitions were discovered during residential construction on property near AU in 1992, *Loughlin,* 230 F.Supp.2d at 31, and in January 1993. (Compl.¶ 31.) In response, the Army initiated a response action pursuant to the Defense Environmental Restoration Program and CERCLA on January 5, 1993. (*Id.* ¶ 31.) Within the first month of its response, the Army removed 141 ordnance items from the World War I era. It subsequently discovered additional live munitions, spent ordnance and other debris and conducted soil sampling. (*Id.* ¶¶ 32–33.) In June 1995, the Army concluded its response action finding that there were "no risks posed by hazardous substances that exceed acceptable health levels for human health or the environment," and thus, no further action was needed. (*Id.* ¶ 33.)

In 1999, in response to recommendations from the District of Columbia, EPA conducted additional soil testing for the presence of arsenic and, along with the District of Columbia Department of Health ("DCH") and the Army Corps of Engineers ("Corps"), searched for additional munitions burial sites. (*Id.* ¶¶ 35–37; U.S. Mem. at 2.) In 2001, the Corps began an extensive plan to conduct soil sampling on each of the 1,155 residential properties in Spring Valley. (Compl.¶¶ 42–43.) Where preliminary test results showed elevated arsenic levels, the Corps conducted additional sampling and advised homeowners that it would contact them to discuss future actions. (*Id.* ¶ 43.) The Corps determined that properties with soil samples

yielding arsenic levels greater than the EPA's emergency response guideline typically required "some form of intervention or remediation." (*Id.* ¶ 47.) Properties with the greatest levels of arsenic were targeted by the Corps for Time Critical Removal Action ("TCRA"). (*Id.* ¶ 49.) As of July 2002, the Corps had identified seven such properties. (*Id.* ¶ 49.)

Pursuant to its responsibilities under CERCLA, 42 U.S.C. § 9616, the Corps is proceeding at this time with cleanup activities in Spring Valley, including removal actions and the selection of a final remedy. (U.S. Mem. at 3.) The Army's long-term remedial response will be outlined in a Remedial Investigation/Feasibility Study (RI/FS) that will be subject to public comment before it is finalized, as required by CERCLA, 42 U.S.C. § 9617. (*Id.;* Compl. ¶ 50.) At that point, a final remedy, also subject to public comment, will be selected. (U.S. Mem. at 3.)

Plaintiffs argue that their activities in their house, yard and neighborhood have been impacted as a result of the government's World War I activity in Spring Valley. (Compl. ¶ 67.) In addition, they claim that the value of their property has been diminished because they are required to disclose the arsenic contamination on their property and in their neighborhood to potential buyers. (*Id.*) Thus, plaintiffs allege that the government's contamination of their property and their neighborhood constitutes an unconstitutional taking of private property. (*Id.* ¶ 72.) The Complaint also contains state tort claims for failure to warn, private and public nuisance, trespass, and strict liability against AU. (*Id.* ¶¶ 73–100.)

Plaintiffs seek to bring this suit as a class action pursuant to Fed.R.Civ.P. 23 on behalf of themselves and all others similarly situated members of a proposed class consisting of owners of residential property in Spring Valley. (*Id.* ¶ 12.) They seek the implementation of a Property Value Protection Plan ("PVPP") as a remedy. The PVPP would require defendants to: (1) prepare with regularity information packets about contamination and cleanup efforts in Spring Valley for distribution to prospective buyers; (2) designate an information officer to handle all inquiries from sellers, prospective buyers and realtors; (3) appraise all Spring Valley properties; and (4) purchase Spring Valley properties where a seller's best efforts to sell fail to yield an offer at or exceeding the appraised value. (*Id.* at 27.)

The government has moved to dismiss plaintiffs' claim for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). The government argues that it is immune from suit because "Congress specifically limited the waiver of immunity under CERCLA to prevent lawsuits ... which second-guess and delay the completion of a cleanup." (U.S. Mem at 2.)

## LEGAL ANALYSIS

### I. Government Immunity under CERCLA

CERCLA was enacted to ensure the efficient and expeditious cleanup of sites contaminated with hazardous wastes and other pollutants. *Oil, Chemical & Atomic Workers International Union (OCAW) v. Pena,* 62 F.Supp.2d 1, 3–4 (D.D.C.1999), *aff'd,* 214 F.3d 1379 (D.C.Cir.2000). The cleanup process is divided into two categories: short term "removal" actions (to study and clean up contamination) and permanent or long term "remedial" actions ("taken instead of or in addition to removal actions"). 42 U.S.C. § 9601(23), (24).

Congress amended CERCLA in 1986, adding section 113(h), which denies federal courts subject matter jurisdiction to hear challenges to removal and remedial actions

taken under CERCLA until those actions are complete. 42 U.S.C. § 9613(h). The "Timing of Review" section states that "[n]o federal court shall have jurisdiction under federal law ... to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606 of this title." *Id.*

"The rationale behind the enactment of this section rested heavily on Congressional findings that CERCLA, as drafted in 1980, was not adequately allowing the EPA to rapidly clean up toxic waste sites that were endangering public health." *Farmers Against Irresponsible Remediation (FAIR) v. EPA,* 165 F.Supp.2d 253, 258 (N.D.N.Y.2001). Thus, the purpose of section 9613(h) "is to ensure that there will be no delays associated with a legal challenge of the particular removal or remedial action selected." H.R.Rep. No. 99–253(V), at 25–26 (1985).

The bar to challenges to CERCLA cleanup activities is subject to limited exceptions not applicable here, but "once an activity has been classified as a CERCLA § 9604 removal or remedial action, § 9613(h) 'amounts to a blunt withdrawal of federal jurisdiction.'" *Costner v. URS Consultants,* 153 F.3d 667, 674 (8th Cir. 1998) (quoting *Hanford Downwinders Coalition v. Dowdle,* 71 F.3d 1469, 1474 (9th Cir.1995)); *see also OCAW,* 214 F.3d at 1382; *North Shore Gas Co. v. EPA,* 930 F.2d 1239, 1244 (7th Cir.1991); *FAIR,* 165 F.Supp.2d at 259.

This Court has noted that "nearly every court to address the scope of Section 113(h) has concluded that litigation which interferes with even the most tangential aspects of a cleanup action is prohibited." *OCAW,* 62 F.Supp.2d at 10. In *OCAW,* employees at a nuclear plant sought to enjoin the government from recycling the waste produced by a CERCLA cleanup program without preparing an environmental impact study required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C). The Court found that the claim for an injunction constituted a challenge to the CERCLA removal action, relying in part on a Seventh Circuit decision that also rejected a NEPA challenge pursuant to section 113(h). *OCAW,* 62 F.Supp.2d at 10. In the Seventh Circuit case, plaintiff sought to prevent the EPA from ordering construction of a new boat slip after a planned cleanup action eliminated the use of an old boat slip. *North Shore Gas,* 930 F.2d at 1241. The Circuit determined that "the cleanup action as a whole would be delayed if EPA had to find another way to accommodate the users of the old boat slip, and that even such minimal interference was enough to bar the plaintiff's claim under section 113(h)." *Id.* at 1244.

This broad interpretation supports Congress' efforts "to limit the public's ability to challenge EPA cleanup decisions and bolster CERCLA's goal of granting the EPA 'full reign to conduct or mandate uninterrupted clean-ups'" by enacting section 113(h). *FAIR,* 165 F.Supp.2d at 258 (quoting *B.R. MacKay & Sons, Inc. v. United States,* 633 F.Supp. 1290, 1292 (D.Utah 1986)).

## II. Plaintiffs' Takings Claim

Plaintiffs argue that their claim against the government should not be barred by section 113(h) for two reasons. First, they point out that the Complaint does not contain a claim under CERCLA or any other environmental statute. Second, plaintiffs argue they are not challenging a CERCLA removal or remedial action because they seek "neither a revision of the scope of the cleanup, nor any change in its timing or the stringency of its proposed cleanup standards." (Plaintiffs' Opposition to U.S.

Mot. ["Pls.' Opp."] at 2.)[2] Plaintiffs' arguments must fail since they have misread the governing case law.

Section 113(h)'s prohibition against judicial review of CERCLA action prior the completion of removal and remedial plans is not limited to citizen suits brought under CERCLA or other environmental statutes. *See Costner,* 153 F.3d at 674 ("Section 113(h) precludes 'any challenges' to CERCLA removal actions—not simply those brought under the provisions of CERCLA itself."); *see also Clinton County Comm'r v. EPA,* 116 F.3d 1018, 1027 (3d Cir.1997) (applying rule that federal courts are precluded "from exercising jurisdiction over *any* challenge to a CERCLA action based on a violation of *any* other federal law")(emphasis in original); *Schalk v. Reilly,* 900 F.2d 1091, 1097 (7th Cir. 1990) (statute bars "challenges to the procedure employed in selecting a remedy"); *McClellan Ecological Seepage Situation v. Perry,* 47 F.3d 325, 329 (9th Cir.1995) ("Section 113 withholds federal jurisdiction to review ... claims, including those made ... under non-CERCLA statutes."); *Alabama v. EPA,* 871 F.2d 1548, 1560 (11th Cir.1989); *FAIR,* 165 F.Supp.2d at 260. Nor does "[t]he language of section 113(h) ... distinguish between constitutional and statutory challenges; instead, it delays judicial review of '*any*' challenges to unfinished remedial action." *Broward Gardens Tenants Ass'n v. EPA,* 311 F.3d 1066, 1075 (11th Cir.2002) (emphasis added); *see also Barmet Aluminum Corp. v. Reilly,* 927 F.2d 289, 293, 295 (6th Cir.1991).

The standard for determining whether a claim is barred under section 113(h) is the same regardless of how plaintiffs dress up their claims. A claim is barred as a challenge to CERCLA "if it interferes with the implementation of a CERCLA remedy." *Broward Gardens,* 311 F.3d at 1072. "To determine whether a suit interferes with, and thus challenges, a cleanup, courts look to see if the relief requested will impact the remedial action selected." *Id.* at 1072. Based on this standard, plaintiffs' demands for relief clearly "interfere[ ] with and thus challenge[ ]" the ongoing CERCLA activity in Spring Valley and are thus barred by section 113(h).

For instance, the Eleventh Circuit rejected an argument by residents of Broward Gardens that their claim for injunctive relief consisting of relocation was not a "challenge" to the remedial action selected for a nearby Superfund site. The Court reasoned that "the EPA could have incorporated relocation into ... [the] remedial plan, but chose not to do so" and that granting the relief requested would require the remedial plan to be "altered." *Id.* at 1073. Thus, the Court concluded that "[a]sserting that a remedial plan is inadequate because it fails to include a measure that it could have included is challenging the plan for section 113(h) purposes." *Id.*

In the matter before the Court, plaintiffs make an analogous assertion with respect to a plan that has not yet been formulated. While the relief that plaintiffs request would not require an *alteration* of an existing remedial plan, since the plan

---

**2.** Plaintiffs also assert that they are not suing the government for the ongoing CERCLA cleanup but for the Army's contamination of the property during World War I. As a result, they argue that they are not subject to section 113(h). This argument is utterly absurd. In asking the Court to remedy the alleged taking, plaintiffs are in fact challenging the ability of the government to remedy that injury under CERCLA. In addition, plaintiffs' argument undermines the purpose of the immunity provided by section 113(h) by allowing any litigant to present a claim against the government as one challenging the original government activity that caused the contamination, rather than the cleanup activity.

has not yet been formulated, the relief requested here would necessarily dictate the imposition of certain conditions in any future plan. It is, thus, indistinguishable from the plaintiffs' challenge in *Broward Gardens.*

At this time, the Corps is in the process of developing an RI/FS and a final remedial plan for Spring Valley and is exploring some of the very same remedies that plaintiffs seeks here. (U.S. Reply at 11.) In fact, the issues raised and relief requested by plaintiffs have been discussed by the statutorily-mandated Restoration Advisory Board ("RAB"), which includes Spring Valley residents and representatives from the EPA, the Corps, and the DCH. (*Id.* note 6.) The RAB has also established task groups to investigate remedial options, including property value indemnification, insurance for property values, property tax assessments, and warranties regarding the future discovery of contamination. (*Id.* at 11.) The RAB's recommendations will be forwarded to the Corps, EPA, and DCH for consideration in developing final remedial action for Spring Valley. (*Id.* at 12.) A court order requiring the government to implement the PVPP developed by plaintiffs would clearly interfere with this process, and thus, plaintiffs' attempt to bypass this process through litigation presents the very type of challenge to the CERCLA cleanup effort that is barred by section 113(h). *See Razore v. Tulalip Tribes of Washington,* 66 F.3d 236, 240 (9th Cir. 1995) (Section 113(h) bars claims regarding site undergoing RI/FS study where "plaintiffs attempt to dictate specific reme-

dial actions ... prior to a determination of the ultimate remedial plan."); *Schalk,* 900 F.2d at 1097 ("challenges to the procedure employed in selecting a remedy ... impact the implementation of the remedy and result in the same delays Congress sought to avoid by passage of the statute").

A remedial investigation may include the gathering of information to determine the need for remedial action or the evaluation of remedial alternatives, and removal actions may include any actions necessary "to minimize or mitigate damage to the public health or welfare". 40 C.F.R. § 300.5 (2003). A court order instructing the government to collect and communicate information relating to the condition of Spring Valley properties as proposed by plaintiffs' PVPP would clearly interfere with the RI/FS and remedial plans for the area by requiring that certain actions be included in these plans.

The PVPP would also interfere with ongoing removal activities by potentially requiring the government to reconsider its cleanup priorities. The current removal plan targets properties with the highest levels of contamination for immediate action. (Compl. ¶ 49; U.S. Mem. at 3.) Requiring the government to "act as a purchaser of last resort" (Pls.' Opp. at 4) if property owners are unable to sell homes for their appraised value would create pressure to target properties where a sale is imminent in order to avoid this requirement. Thus, the PVPP would create conflicting remedial goals that could delay both the development of the final remedial plan and the actual cleanup.[3]

---

**3.** Moreover, to the extent that any portion of plaintiffs' claim is not barred by CERCLA, it could only be construed as a claim for damages due to the diminution in the value of plaintiffs' property, since this type of economic loss has been found not to be recoverable under CERCLA. *See Beck v. Atlantic Richfield Co.,* 62 F.3d 1240, 1243 (9th Cir.1995);

*Wehner v. Syntex Corp.,* 681 F.Supp. 651, 653 (N.D.Cal.1987). Plaintiffs, however, refuse to acknowledge that their claim is one for damages, since they recognize, as they must, that any such claim would fall within the exclusive jurisdiction of the United States Court of Federal Claims pursuant to the Tucker Act, 28

In response, plaintiffs fail to cite any legal authority in support of their position, nor do they offer any principled basis for distinguishing their claims from the countless claims that have uniformly been rejected by circuit courts as interfering with ongoing CERCLA remedial and removal actions in violation of section 113(h). The Court lacks subject matter jurisdiction over these plaintiffs' claims, and therefore, their complaint against the government is dismissed with prejudice.

Since the Court is dismissing this case pursuant to 12(b)(1), it is precluded from exercising supplemental jurisdiction over related state claims, and therefore it must dismiss without prejudice the claims against AU for lack of subject matter jurisdiction. *FAIR*, 165 F.Supp.2d at 258 ("when a court dismisses a case pursuant to 12(b)(1), it is precluded from exercising supplemental jurisdiction over related state claims"); *see also Saksenasingh v. Sec'y of Educ.*, 126 F.3d 347, 351 (D.C.Cir. 1997) (where district court "dismissed the underlying claim on jurisdiction grounds ... it could not exercise supplemental jurisdiction" over remaining claims).

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiffs' claim against the government is a challenge to the CERCLA removal and remedial action in Spring Valley, and therefore, the Court lacks subject matter jurisdiction pursuant to section 113(h) of CERCLA. Consequently, the government's motion to dismiss is granted and the remaining claims against American University are dismissed without prejudice.

A separate Order accompanies this Opinion.

U.S.C. § 1346(a)(2), and would have to be

## *ORDER*

For the reasons set forth in the Memorandum Opinion accompanying this Order, it is hereby

**ORDERED** that the United States' Motion to Dismiss Claim for Relief Against the United States [6–1] is **GRANTED** and that plaintiffs' claims against the United States are **DISMISSED WITH PREJUDICE**; it is

**FURTHER ORDERED** that plaintiffs' claims against The American University are **DISMISSED WITHOUT PREJUDICE**; and it is

**FURTHER ORDERED** that the above-captioned complaint is **DISMISSED**.

**SO ORDERED.**

dismissed for this reason as well.